656 A.2d 35

JERSEY CITY REDEVELOPMENT AGENCY, A BODY CORPORATE AND POLITIC OF THE STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. THE MACK PROPERTIES CO. # 3, LIMITED PARTNERSHIP, AND MACK ADVISORS CORP., A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANTS–APPELLANTS, AND BANKERS LIFE COMPANY, AN IOWA CORPORATION; K–MART CORPORATION, A CORPORATION OF

THE STATE OF MICHIGAN, U.S. PACKING & SHIPPING CO.,
INC., A CORPORATION OF THE STATE OF NEW YORK;
STATE OF NEW JERSEY; CITY OF JERSEY CITY; JERSEY
CITY SEWERAGE AUTHORITY; AND B. DALTON COMPANY,
A CORPORATION OF THE STATE OF MINNESOTA, DEFEN-
DANTS.

Superior Court of New Jersey
Appellate Division

Argued December 12, 1994—Decided April 7, 1995.

556

558

Before Judges PETRELLA, HAVEY and BROCHIN.

*Stanley Tannenbaum* argued the cause for appellants (*Sills Cummis Zuckerman Radin Tischman Epstein & Gross, P.A.,* attorneys; *Mr. Tannenbaum,* of counsel; *Bryan S. Greenberg,* on the briefs).

*John J. Curley* argued the cause for respondent (*Lepis, Lepis & Curley,* attorneys; *Mr. Curley* and *Natalie E. Feehan,* on the brief).

The opinion of the court was delivered by

HAVEY, J.A.D.

This is a condemnation case. Defendants The Mack Brothers Company # 3 and Mack Advisors Corp. (Mack) appeal from a judgment, entered after remand, which reconfirms a prior determination by the trial judge fixing fair-market value of Mack's condemned property at $1,953,000, based on its use as a warehouse. On appeal, Mack argues that the trial judge failed to make findings of fact as mandated by our prior opinion concerning whether a hypothetical buyer would deem it reasonably probable that, as of the date of taking: (1) the subject property could be developed for a use other than warehousing based on existing zoning; or (2) a zoning change or use variance would be granted in the near future allowing more intense uses than permitted under existing zoning standards. We reverse and remand for further proceedings.

On April 7, 1986, plaintiff Jersey City Redevelopment Agency (JCRA) filed a complaint condemning Mack's property, a 5.05 acre parcel in Jersey City, situate on the Hudson River waterfront. The parcel, on which is located a 44,850 square foot warehouse built in 1974, is in the "intensive industrial" use zone (I–2) which allows warehouse and other industrial uses, as well as office complexes with a floor-to-area ratio (FAR) of 3:1.[1] The parcel is one of the few large tracts remaining undeveloped on the Jersey City waterfront. The trial judge himself described the property as having a "breathtaking view across the Hudson River of Battery Park and the Twin Towers of the World Trade Center in lower Manhattan."

JCRA intended, upon condemnation, to convert the property from warehouse to a high-density office and residential mixed use as part of Harsimus Cove South Redevelopment Plan. Nevertheless, during the original bench trial JCRA's valuation expert concluded that the subject property's highest and best use was industrial development, predicated on his study of a universe of 80.7 acres surrounding the property. In contrast, Mack's experts testified that the property was well suited for high-rise, residential and office development based on the significant demand for and actual construction of such uses in Jersey City during the previous decade. They concluded that, given the high density of the new developments along the Jersey City waterfront, the subject property was valued at $9.9 million based on a high-rise residential or office complex with an 8:1 FAR, assuming the likelihood that necessary zoning changes or variances could be obtained. Alternatively, Mack's experts stated that the property had a value of $5,270,000 as an office building with a FAR of 3:1, which conformed to existing zoning standards. In support of its claim, the experts made reference to the evolution of land use along the

---

[1] The City's ordinance refers to floor-to-area ratio as "3.0," not 3:1. The ordinance does not explain the relationship of the numbers. Both parties in their briefs, and the trial judge in his opinion, refer to the FAR as "3:1." This "ratio" is also not explained.

waterfront in the last decade, as well as generous governmental action approving zoning changes or variances and encouraging redevelopment plans through tax abatements.

For example, Mack established that immediately south of the property a 1.8 million square-foot warehouse terminal was converted to an office and commercial use complex. Approximately 1,000 feet north, a 4.3 million square-foot office, retail and residential complex was planned. Another office complex containing 325,000 square feet south-west of Mack's property had been approved in 1983 and completed in 1987. Further, the City's 1984 Master Plan depicts the subject property as part of a mixed-use area, consisting of residential and office uses.

A central issue during the original bench trial was whether Mack's alternative proposals for high-rise residential or office use were feasible. Thus, competing testimony was presented concerning: (1) the probability of a zone change or grant of a use variance; (2) the feasibility of plans for off-site development of nearby streets to provide access to the proposed uses; (3) the financial feasibility of constructing a bridge over a Conrail easement, if necessary; and (4) whether Mack would obtain a tax abatement for the subject property. JCRA argued that: (1) rezoning was unlikely; (2) no tax abatement would be forthcoming; (3) an existing sewer moratorium would prevent the development; and (4) Mack could not overcome other physical impediments to construction of its proposed uses. In response, Mack's battery of experts gave exhaustive and detailed testimony to the contrary, detailing the methods to be employed in overcoming the development handicaps, and plans which they asserted were economically feasible and consistent with sound planning. Moreover, Mack's experts presented their testimony in the context of whether a hypothetical buyer and seller would consider the prospect of obtaining all necessary approvals was reasonably probable.

In a written opinion dated February 5, 1990, the trial judge accepted JCRA's proofs and concluded that the highest and best use of the property was for warehousing. Implicitly, the judge

found insignificant the historical development of the waterfront as a whole and adopted JCRA's expert's "universe" of 80.7 acres surrounding the property in concluding that the prevailing characteristics of the neighborhood were industrial in nature. The judge also stressed the physical impediments to Mack's proposals and the manner by which it intended to overcome them. He characterized Mack's proofs as "speculation and conjecture, resting upon a fragile chain of attenuated, interdependent assumptions." However, he made no findings regarding the testimony of Mack's experts that a buyer and seller, in fixing value, would reasonably believe that the impediments could be overcome. Accordingly, the judge fixed the fair-market value of the property at $1,953,000, based on the property's value as a warehouse use.

In an unreported *per curiam* opinion rendered on March 24, 1992 (A–6465–89T5), we reversed and remanded. Citing *State v. Gorga*, 26 *N.J.* 113, 138 *A.*2d 833 (1958), and other pertinent case law, we identified two "central questions" which must be addressed in resolution of the question of value:

 (1) whether a hypothetical buyer, acting without compulsion, would deem it reasonably probable that the subject property could be developed for a use other than warehousing in the near future based on existing zoning restrictions; and

 (2) whether the hypothetical buyer would deem it reasonably probable that a zoning change or the grant of a variance in the near future would allow even more intense uses of the property than permitted under existing zoning standards.

We remanded with direction that findings of fact and conclusions of law be made in the context of these questions, leaving it to the trial judge to decide whether additional testimony should be received. JCRA's petition for certification was denied by the Supreme Court. *See* 130 *N.J.* 18, 611 *A.*2d 656 (1992).

On remand, the parties provided extensive proposed findings of fact and conclusions of law to the trial judge. Without taking additional testimony, the judge reiterated his previous finding that the subject property had a fair-market value of $1,935,000, based on a warehouse use. Noting the stipulations of the parties concerning problems regarding access as well as the testimony

concerning the physical impediments to the construction by Mack of its proposed high-rise or office complexes, the judge concluded:

> The impediments to optimal use of the property in a manner sanctioned by new zoning regulations, namely, for vehicular access and inadequate water and sewer lines, render the likelihood of a change in zone to permit higher density residential or office use irrelevant. Indeed, although existing zoning regulations permitted the construction of an office building with an FAR of 3:1, the same impediments that the parties agreed existed would preclude such construction.

The judge also noted that "another factor which renders the likelihood of a zoning change irrelevant is the imbedded industrial character of the immediate physical environment." The judge characterized our analysis of Mack's proofs and what consequence overcoming the development impediments may have on value as "cavalier." Without even acknowledging our directive that he address what we perceived to be the central issues in this condemnation case, the judge made no additional findings.

It is the responsibility of a trial court to comply with the pronouncements of an appellate court. *Daniel v. State, Dep't of Transp.*, 239 *N.J. Super.* 563, 582, 571 *A.2d* 1329 (App.Div.), *certif. denied*, 122 *N.J.* 325, 585 *A.2d* 343 (1990). It is the peremptory duty of the trial court, on remand, to obey the mandate of the appellate tribunal precisely as it is written. *Flanigan v. McFeely*, 20 *N.J.* 414, 420, 120 *A.2d* 102 (1956). "Trial judges are privileged to disagree with the pronouncements of appellate courts; the privilege does not extend to non-compliance." *Reinauer Realty Corp. v. Borough of Paramus*, 34 *N.J.* 406, 415, 169 *A.2d* 814 (1961).

Inexplicably, the trial judge here ignored our directive to make findings in accordance with what we deemed well-settled principles of condemnation law. Instead, he found that these legal principles were "irrelevant" and characterized our legal analysis, applying those principles, as "cavalier." As a result, nine years after condemnation, we still have no meaningful analysis by a fact-finder concerning value predicated on condemnation law.

Nevertheless, while we acknowledge the time delay resulting in the trial judge's noncompliance with our remand opinion, we

decline Mack's invitation to exercise original jurisdiction in disposing of the matter. Our original fact-finding authority must be exercised only "with great frugality and in none but a clear case free of doubt." *In re Boardwalk Regency Corp. Casino License Application,* 180 *N.J.Super.* 324, 334, 434 *A.*2d 1111 (App.Div. 1981), *modified on other grounds,* 90 *N.J.* 361, 447 *A.*2d 1335 (1982). We are therefore constrained to again remand the matter for appropriate findings.

As we understand the trial judge's opinion on remand, he found that the two-step analysis outlined by us was "irrelevant" and "cavalier" because we ignored the fact that Mack's proposed uses, one complying with existing zoning standards and the other requiring a use or zoning change, are predicated on "speculation and conjecture." In other words, the judge held firm in his belief that the highest and best use of the subject property is a warehouse use because there are simply too many physical impediments to developing Mack's property for any other use. Thus, despite our clear directive, the judge never analyzed the facts concerning these impediments to development from the point of view of a buyer and seller engaged in voluntary negotiations over fair-market value; that is, whether such a buyer and seller would reasonably believe that these physical impediments could be overcome and, if so, whether this prospect would have an impact on the value of property regardless of the degree of probability. *See Gorga,* 26 *N.J.* at 117–18, 138 *A.*2d 833. *See also, State v. Caoili,* 135 *N.J.* 252, 264–65, 639 *A.*2d 275 (1994) (in the fact-finder's consideration of evidence of a zoning change, the inquiry is the reasonable belief of buyer and seller that a change may occur regardless of degree of probability).

Some pertinent and well-established principles of condemnation law must be repeated. When property is taken under the Eminent Domain Act of 1971, *N.J.S.A.* 20:3–1 to –50, the measure of damages is the fair-market value of the property as of the date of taking "determined by what a willing buyer and a willing seller would agree to, neither being under any compulsion

to act." *State v. Silver,* 92 *N.J.* 507, 513, 457 *A.*2d 463 (1983). "Fair market value" is that value assigned by knowledgeable parties freely negotiating under normal market conditions "based on all surrounding circumstances at the time of the taking." *Id.* at 514, 457 *A.*2d 463. Of course, a determination of fair-market value requires the antecedent finding as to highest and best use of the property. *State v. Hope Road Assocs.,* 266 *N.J.Super.* 633, 641, 630 *A.*2d 387 (App.Div.1993), *modified on other grounds,* 136 *N.J.* 27, 641 *A.*2d 1038 (1994).

The reasonableness of a use of condemned property, including its highest and best use, "must be considered in light of any zoning restrictions that apply to the property." *Caoili,* 135 *N.J.* at 260, 639 *A.*2d 275. It is well-settled that "the owner shall receive the fair market value of the land for *any* use for which it has a commercial value in the immediate present or in reasonable anticipation in the near future." *Gorga,* 26 *N.J.* at 116, 138 *A.*2d 833 (emphasis added). Hence, zoning restrictions that govern the use of the property are material factors in determining its fair-market value. *Ibid.* Nevertheless, when zoning restrictions do not permit development of the property for its highest and best use, an owner may demonstrate that there is a prospect of a zoning change in the near future that would allow such a use. "It is generally agreed that if as of the date of taking there is a reasonable probability of a change in the zoning ordinance in the near future, the influence of that circumstance upon the market value as of that date may be shown." *Id.* at 116, 138 *A.*2d 833.

Since our remand, our Supreme Court in *Caoili,* 135 *N.J.* at 262–64, 639 *A.*2d 275, restated the teachings of *Gorga* and *Gorga's* two-step analysis concerning whether the prospect of a zoning change would affect value in condemnation cases. *Caoili* states that in determining fair-market value of condemned property, the trial court must first be satisfied that the evidence of a prospective zoning change "is sufficient to warrant a determination that such a change is reasonably probable." 135 *N.J.* at 265, 639 *A.*2d 275. Once the trial court makes that determination, the jury decides

whether a buyer and seller engaged in voluntary negotiations over fair-market value would have a reasonable belief that a zoning change "may occur" and, if so, will that belief have an impact on the value of the property "regardless of the degree of probability." *Id.* at 264–65, 639 *A.*2d 275.

Also, the *Caoili* Court, in addressing the valuation methodology used in prospective zoning-change cases, noted that:

so long as the method used yields a current value rather than a future value, whether the appraiser starts with the value as currently zoned and adjusts upward, assigning a "premium" to reflect the likelihood of a zoning change, or starts with the value of the property as it is likely to be zoned in the future, assigning a "discount" of that value to account for the likelihood of such a zoning change, would not appear significant.

[135 *N.J.* at 271–72, 639 *A.*2d 275.]

In *State v. Hope Road Assocs.*, we held that the prospect of acquiring an off-site easement for the purpose of obtaining a site plan approval for an office complex "is not intrinsically different from the reasonable probability of a zoning change." 266 *N.J. Super.* at 645, 630 *A.*2d 387. In other words, the fact-finder may consider the potential uses of the subject property based on its present zoning "and its adaptability to the proposed use[.]" *Ibid.* We stated that the fact-finder should be allowed to consider the reasonable probability of the owner surmounting any "development handicaps, such as acquiring reasonable access, so that the site may be developed as proposed." *Ibid.* See also, *Salem Country Club, Inc. v. Peabody Redevelopment Auth.*, 21 *Mass. App.Ct.* 433, 487 *N.E.*2d 864, 865–66, *review denied*, 396 *Mass.* 1107, 489 *N.E.*2d 1263 (1986); *DiBiase v. Town of Rowley*, 33 *Mass.App.Ct.* 928, 598 *N.E.*2d 690, 691 (1992). We cautioned, however, that "[b]efore submission of the question to the jury, there must be some showing of the reasonable probability of such eventuality[.]" *State v. Hope Road Assocs.*, 266 *N.J.Super.* at 645–46, 630 *A.*2d 387.[2]

---

[2] *Hope Road Assocs.* was modified by the Supreme Court "to the extent that the new trial pursuant to [our] remand ... shall be conducted in the light of this Court's decision ..." in *Caoili.* 136 *N.J.* at 27, 639 *A.*2d 275.

In examining the facts concerning the development handicaps testified to in this case, the trial judge must apply the *Gorga/Caoili* two-step analysis. First, the judge must determine whether the evidence presented by Mack is sufficient to warrant a determination that, as of the date of taking, surmounting the development handicaps and obtaining necessary governmental approvals, was reasonably probable. To satisfy this threshold step, Mack is required to come forward with reliable evidence that the "feasibility, suitability and practicability" of its proposal, *Caoili*, 135 *N.J.* at 269, 639 *A.*2d 275, make it reasonably probable that the development handicaps will be overcome and the requisite approvals will be secured. In making this threshold determination, the court should apply its "gatekeeping function" by screening out "inherently vague or tenuous" proofs and admitting only evidence that would "warrant ... a finding" that it is reasonably probable that Mack will succeed in its proposed endeavors. *Id.* at 264, 639 *A.*2d 275. Relevant to that inquiry is the fact that, as of the date of taking, Mack's office-building proposal with an FAR of 3:1 "was fully authorized by current local land-use regulations." *Id.* at 269, 639 *A.*2d 275.

If the threshold step is satisfied, the fact-finder must decide whether a buyer and seller engaged in voluntary negotiations over the fair-market value of the condemned property would reasonably believe that the development handicaps *may* be overcome and approvals *may* be obtained "regardless of the degree of probability." *Id.* at 264–65, 639 *A.*2d 275. If so, the question then becomes to what extent this reasonable belief would impact on the value of the property.

There was substantial competing evidence concerning the effect of an existing sewer moratorium as of the date of taking. JCRA took the position that the moratorium foreclosed any possibility of approval of Mack's proposed uses. However, Mack's experts testified that such a moratorium would not prevent its proposed developments, referring to several projects then in development stage despite the moratorium. The experts also noted that the

City of Jersey City itself had instructed prospective developers that "since the sewer ban started in August of 1985, DEP has approved every Jersey City application for either a dry or wet permit." Further, with respect to the Conrail easement impeding access to the property, JCRA's expert testified that the rail line on the easement was "active," whereas Mack's experts stated that the existing rail lines would be discontinued in the near future. Mack's experts also presented a second alternative: construction of a fly-over bridge over the rail lines. A central question was whether the construction of such a bridge would make Mack's proposals economically unfeasible.

There was also testimony concerning the resolution of off-site traffic problems projected by the anticipated congestion resulting from Mack's proposals, including the construction of off-site improvements, and Mack's willingness to make contributions to pay for such improvements. *See N.J.S.A.* 40:55D–42. Another issue raised was the prospect of Mack securing a tax abatement, and whether construction of the proposals without such abatements was economically sound.

We focus on these issues only for the purpose of underscoring the necessity of the trial court to weigh the respective proofs, expert or otherwise, in applying the two-step *Gorga/Caoili* analysis, and to make specific findings predicated upon what a reasonable buyer and seller would consider in fixing the value of the condemned land.

As stated, in our remand opinion we also directed the trial judge to address a "second" central question: whether the hypothetical buyer would deem it reasonably probable that a zoning change or the grant of a variance in the near future would allow even more intense uses of the property than permitted under existing zoning standards. The trial judge viewed this question as "irrelevant."

This question must also be addressed, as modified by the two-step analysis set forth in *Caoili*. JCRA's experts opined that

there was no reasonable probability of a zoning change or the grant of a special reasons variance to permit a high-rise complex with an FAR ratio in excess of 3:1. They stressed that the proposal would be incompatible with the warehouse uses surrounding the property. Also, they stated that because such a high-rise would have a detrimental impact on existing off-site traffic congestion, and because of access problems, the proposal would be unsuitable and contrary to sound planning. In contrast, Mack's experts focused on the historical transformation of the Jersey City waterfront, spawned by the generous governmental approvals which encouraged redevelopment, and the fact that its proposed uses were compatible with this redevelopment, in arguing that rezoning was reasonably probable. Mack also pointed to the City's Master Plan itself, which depicts the subject property as part of a residential and office-use area. We do not intend to comment upon the worth of any of the expert testimony offered by both sides, except to again underscore the necessity that explicit findings be made by the trial court in accepting or rejecting the proofs in applying the *Gorga/Caoili* analysis.

 It is necessary that we address one final point. In his opinion rendered after our remand, the trial judge made the following comment:

> The Appellate Division declared that the proposed use of the condemnor may be considered in determining the potential value of the property to be condemned, citing 4 Nichols, *Law of Eminent Domain*, ¶ 12B.14[2] at 181 (3rd ed. 1990). Slip op. at 11. This statement is palpably erroneous as a matter of law. In *Housing Authority of Atlantic City v. Atlantic City Exposition, Inc.*, 62 *N.J.* 322 [301 *A.2d* 441] (1973) the New Jersey Supreme Court held that improvements or changes contemplated by the condemning authority cannot be taken into account in determining just compensation, citing *Jersey City Redevelopment Agency v. Kugler*, 58 *N.J.* 374, 379 [277 *A.2d* 873] (1971). See also *State Acting By the Through Roe v. Wemrock Orchards, Inc.*, 95 *N.J.Super.* 25 [229 *A.2d* 804] (App.Div.1967).

What is "palpably erroneous" is the trial judge's understanding of our remand opinion. By citing *Housing Auth.* and *Jersey City Redevelopment Agency*, the judge suggests that we viewed the prospect of condemnation by JCRA for office and residential use as being a factor in enhancing the value of the subject property as

of the date of taking. This is simply not so. There is no question that the proper basis for compensation is the value of the property as it would be at the time of the taking "disregarding either the depreciating threat of or the inflationary reaction to the proposed public project." *Jersey City Redevelopment Agency,* 58 *N.J.* at 379, 277 *A.*2d 873. *See also, Housing Auth.,* 62 *N.J.* at 330, 301 *A.*2d 441 ("[i]mprovements or changes contemplated by the condemning authority and undertaken at its expense cannot be taken into account in determining just compensation"). However, nowhere in our prior opinion do we even suggest that there should be an enhancement in value because of an "inflationary reaction" to JCRA's proposed use. We observed in the opinion:

> Although the voluminous expert testimony presented conflicting opinions as to the feasibility of developing the property as proposed by Mack, it is undisputed that JCRA has taken the property for precisely the same use as proposed by Mack. It is settled that the proposed use of the condemnor may be considered in determining the potential value of the property to be condemned. 4 Nichols, § 12B.14[2] at 181.

By citing Nichols, we were merely recognizing that JCRA's contemplated changes in connection with its proposed project, involving office and residential use, may be relevant as to the adaptability of the property to Mack's proposals, and to the issue of highest and best use of the property for the purpose of fixing value. Regrettably, the trial judge failed to understand the point we were making.

Reversed and remanded for further proceedings consistent with this opinion. The remand judge shall make findings of fact and conclusions and, if necessary, permit additional proofs.