851 A.2d 652 (2004)
370 N.J. Super. 372
CITY OF LINDEN, COUNTY OF UNION, New Jersey, Plaintiff-Appellant,
v.
BENEDICT MOTEL CORP., a New Jersey Corporation, a/k/a Benedict Motel, Inc., a New Jersey Corporation, a/k/a Benedict Apartments Corp., a New Jersey Corporation, swan associates, a New Jersey General Partnership, Swan Recreation, Inc. And Benedict Motel, Inc./Fine & Nathanson, t/a Swan Motel, a New Jersey General Partnership, Stanley Nathanson and David A. Nathanson, Lori S. Nathanson, Randi Nathanson, New Jersey National Bank, its successors, and/or its assigns, City Of LindenState Of New Jersey, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued December 17, 2003.
Decided February 11, 2004.
*655 Peter A. Buchsbaum argued the cause for appellant (Greenbaum, Rowe, Smith, Ravin, Davis & Himmel, Woodbridge, and Fahey & Fahey, Springfield, attorneys; Mr. Buchsbaum and Brian W. Fahey, of counsel; Michele Gibson and Dean A. Gaver, Woodbridge, on the brief).
William J. Ward, Florham Park, argued the cause for respondents (Carlin & Ward, attorneys; Mr. Ward, of counsel; Mr. Ward, John J. Carlin, Jr., and Arthur G. Warden, III, on the brief).
Before Judges CARCHMAN, WECKER and WEISSBARD. *653
*654 The opinion of the court was delivered by CARCHMAN, J.A.D.
As part of a redevelopment plan and to widen Routes 1 and 9, plaintiff City of Linden (City) instituted a condemnation proceeding against the Benedict Motel (Motel) and other interested parties (collectively, "defendants") to effect a partial taking of a fifteen-foot wide strip fronting the Motel. The most dramatic impact of the taking is the elimination of fifteen parking spaces that had existed on the Motel's property fronting on Route 1.
While other claims of error are asserted, the issue dominating this appeal is the legal status of these parking spaces. The City claims that no approval was granted for the parking spaces in the first instance. Relying on our decision in Comm'r of Transp. v. Faps Realty, Corp., 197 N.J.Super. 44, 484 A.2d 35 (App.Div.1984), the City also asserts that the use of such spaces requires maneuvering within the State right-of-way, and the Motel is not entitled to damages for the loss of the spaces.
Judge Beglin determined as a matter of law that the fifteen spaces had been lawfully created and properly utilized, and the Motel was entitled to compensation for remainder damage. The jury returned a verdict in the amount of two million dollars. We affirm.

I.
These are the relevant facts adduced at trial.[1] Defendants Stanley Nathanson and his son David Nathanson, partners in the ownership of the Motel located on the northbound side of Routes 1 and 9 in Linden, purchased the property in 1967, at which time the Motel had seventy-two rooms. In 1971, the Motel was expanded to add thirteen units to the second floor, for a total of eighty-five units. Fifteen parking spaces were added to the property front, for a total of eighty-nine parking spaces.
On September 21, 2000, the City filed a complaint to effect a taking of a fifteen-foot wide strip of Motel property, 3,885 square feet of land, to widen Routes 1 and 9. The widening is part of a road improvement project connected with the City's plan to redevelop that area of Linden.[2] The City's appraiser Paul T. Beisser valued the land at $115,700.
The Motel is an active enterprise and generates substantial income, which exceeded 1.1 million dollars in 1999 and 1.3 million dollars in 2000. During both years, *656 the occupancy rate exceeded one hundred percent.
Much of the dispute regarding the status of the parking spaces in issue focused on the approvals allegedly granted in 1971 involving the expansion of the motel by an additional thirteen rooms. While the record is expansive and contradictory as to the "legality" of the parking spaces, the claim relies on the recollection of and documentation supplied by Stanley Goodman, the architect retained to perfect the 1971 expansion. Goodman offered that the zoning approval included approval of the parking. He acknowledged that parking was an issue at the time the plan was proposed, and consequently, Goodman was required to provide for thirteen additional parking spaces to obtain approval for the motel expansion. The plan offered at trial did not contain indicia of approval from the City, but the site plan depicted thirteen angled parking spaces in the front of the motel. A critical dispute arose as to whether the zoning approval included approval of this parking. While Goodman was firm in his recollection of the approvals, the City engineer claimed that no record of approval was found except, as the City construction officer indicated, approval for an additional thirteen rooms with no mention or indication of approval for additional parking. This was despite contradictory indications from the City that parking would have been explored if a variance had been required.
Regarding the site plan and the impact of the taking, Goodman stated that he designed the access to allow cars to decelerate while entering the motel, rather than being forced to make a sharp right-hand turn off the busy, fast highway. The motel office was placed in the corner to provide the best vantage point from which to control and monitor the motel's activities. The taking, however, impacted on the property by eliminating the front parking, relocating the office to maintain the ability to supervise the traffic into and out of the motel, and effecting the loss of additional parking spaces due to the relocation of a dumpster. With the loss of the parking, also, the site became a nonconforming use and failed to maintain the number of required spaces per unit. The impact of this was clear. If the motel were to seek any future alterations to the building, the motel would require a variance and the attendant municipal approvals. Not only would the waiver process prove more costly and time-consuming, but the motel had no guarantee of approval.
Critical to the primary issue in dispute, Karl A. Pehnke, plaintiff's expert witness and manager of the road improvement project undertaken by the State Department of Transportation, who conducted an engineering study for the City regarding the impact of the road widening on the Motel, observed that the Goodman plan would not have worked because a car backing out of the space would have only a ten-foot wide aisle in which to maneuver. Pehnke noted that the spaces, though entirely on motel property, were illegal because the aisle of circulation for vehicles entering and backing out of the spaces included the State right-of-way, which he defined as "the area that encompasses both a roadway that the public travels along, as well as a distance beyond the edge of a roadway or a curb-line, or the edge of pavement, which is, basically, what would be your sidewalk area." Here, the claimed right-of-way at the time of the taking was approximately ten feet from the then-existing curb.
As a result, plaintiff's valuation expert Beisser stated that a buyer could not consider the front parking spaces in assessing valuation. Therefore, the condition of the property before the taking and the condition *657 after the taking were the sameseventy-four "legal" parking spaces and eighty-five rooms, and the taking effected no change to the property. Utilizing comparable land sales and making appropriate adjustments, Beisser concluded that the amount of just compensation was $115,700. Beisser did not utilize the income capitalization method to value the land because he found no damage to the remainder.
Subsequently, Beisser prepared a second alternative appraisal. This appraisal assumed that the fifteen parking spaces were illegally approved and then considered that after the taking and reconfiguration of the parking area, the Motel would retain seven usable spaces. After analyzing the data on an income basis, he opined that the damages to the remainder including the loss of the sign was $500,000.
Defense real estate expert Donald Helmstetter reached a different conclusion and opined that the taking resulted in "significant impact on the ongoing operation of the motel property specifically due to the loss of a number of parking spaces that existed prior to the taking and no longer exist once the taking is complete." The seventy-one parking spaces were not enough to support eighty-five units and therefore, would adversely impact the value of the site. As no convenient off-site parking existed to accommodate the motel's parking needs, the loss of parking would result in "a commensurate loss of rental potential for the motel operation." He, too, used an income approach and concluded that the damages including the taking and damages to the remainder was $1,280,500.
Another defense expert Louis Izenberg also valued the property concluding that just compensation for the taking in remainder damages was $2,260,000. Critical to his appraisal, Izenberg calculated the after-taking value of $9,290,000 (as opposed to a before-taking value of $11,550,000) based on a sixty-nine-unit motel, because Izenberg stated that the motel could not rely on the city allowing the motel to operate those units that lack supporting parking spaces.
Contrary to Pehnke's view that the city's after-taking access proposal and the motel's access proposal were substantially the same, defense expert Eric L. Keller concluded that the existing access was unsafe and inappropriate from both a design and operational perspective. Analyzing slope and entry of angle, he observed that vehicles entering and exiting would have to go very slowly so as not to drag their bumpers; furthermore, the design did not conform to state regulations for driveway design. The better access design, Keller stated, placed the access at the north end of the property, resulting in two additional lost spaces. Additionally, the motel proposed to relocate the office to the north side and widen the passageway into the courtyard to allow for two-way traffic, resulting in an additional space being lost. The total parking after the taking would be seventy-one: eighty-nine before-taking spaces, minus fifteen front spaces, minus three spaces due to access and office relocation. The reduced number of parking spaces rendered the motel a nonconforming use.
At the conclusion of the evidence, defendants sought a determination that the front parking spaces were approved spaces such that their loss was a proper element of damages, arguing that they were approved with the approval of the 1971 motel expansion and grandfathered under the 1979 city zoning ordinance. Defendants further argued that the parking was grandfathered under The Highway Access Management Code (Code) regulations, N.J.A.C. 16:47-1.1 to -9.1, implementing the State Highway Access Management *658 Act (Act), N.J.S.A. 27:7-89 to -98, that grandfathered any access and use that existed prior to July 1, 1976. Defendants finally argued, with respect to the front parking, that neither the City nor the State had ever cited the motel for "improper parking or improper use of the State's right of way." Defendants argued that the Act does not prohibit "a car maneuvering in and out of a stall" from crossing the theoretical right of way line, as "any car that utilizes the access utilizes the right of way." The City countered that the front parking issue is a factual matter for the jury to decide, and indeed, whether any parking spaces were lost, and if so, how many, was also a jury issue.
With respect to the additional spaces lost in relocating the driveway, defendants argued for a jury charge regarding their compensability as a result of a change in access. The City responded that the property owner was entitled to reasonable access only, granted by the City approved plan, and that any costs incurred from changing the access point was defendants' choice.
The judge found that the variance for the Motel's expansion was approved and that the approval included the front parking, regardless of the actual number. As the City approved the unit expansion, the parking had to be located in the front as that was the only available location on the site. Judge Beglin found that the City
in the grant of the variance, accepted and approved the plan contemplated providing the 13 parking spaces in front of the building, all on the property of the owner.
The absence, then, of any recordation of separate approval of parking does not become that significant. It's entirely up to the City as to how it chose to keep its records. But it doesn't have legal significance in terms of the rights derived by the property owner as a result of the grant of the variance.
My conclusion is that under the zoning ordinance, those were legally created parking spaces. And therefore, under the law, both the ordinance and the municipal land use law, enjoy nonconforming protection. That is, protection in terms of any subsequent changes on the site.
Regarding the Act, he found that the lot,
in 1976, had 15 parking spaces in use, access to which was over the public right of way. Continuation of that access to and use of the lot is what is grandfathered by these provisions [N.J.A.C. 16:47-1.1] of the Code.
I find that the use of the word use in the Code means more than just use of the access itself at a given point, because elsewhere in the definitional sections of the Code, the word use clearly also references and derives meaning from the functions performed on that lot.
The grandfathering purposes in determining what an access permit would have encompassed before July of 1976, the statute and the Code, I think, compel the conclusion that it would encompass that which existed on this lot, that is the function being performed on the lot. And that function was, in part, the maneuverability of a car in and out of the parking spot on the property of the owner which, in part, would encompass usage of the public right of way.
....
[The Faps] decision spoke of compensability for access for parking spaces located within the public right of way, not located outside of that right of way, but requiring usage of the right of way for maneuverability.
Here the loss of the parking spaces results directly from the taking, not *659 from highway access modification. Therefore, Faps Realty does not, in my judgment, become applicable to what we are now listening to here today.
For these reasons, both in terms of municipal land use or zoning status, and as well State Highway Access, I find that these now 15 spaces to be legally created and protected spaces at the time of the taking, grandfathered under the State Highway Access Code, protected by nonconforming provisions under zoning regulation.
The judge granted both of defendants' requests. At plaintiff's request for clarification, he concluded that the City was estopped from arguing that the approval was for thirteen rather than fifteen spaces. He determined this "based upon what I have found to be the incidental effect of parking upon the main application for variance grant in 1970, and combined with a number of instances where the City has had occasion to review, albeit not as to parking, conditions and usage on the site."
Following the verdict and entry of judgment, the City moved for a new trial based on allegedly newly discovered evidencea 1970 city ordinance relating to parking requirements and David Nathanson's tax appeals. The judge denied the City's motion, finding that the evidence was not material to the issue and could have been discovered with due diligence. He upheld the verdict concluding that it was supported by the evidence.

II.
On appeal, plaintiff asserted that the judge erred as follows: 1) the judge should have applied Faps to bar compensation for defendants' use of the State right-of-way; 2) the judge did not properly place the burden of proof on defendants to establish that the City had approved the front parking spaces; 3) defendants' use of the right-of-way was not grandfathered under the Code; 4) the City had no authority to grant to defendants any rights in the State's right-of-way; 5) equitable estoppel did not prevent the City from arguing that no approval had been given for the parking spaces; 6) the judge should have granted a new trial based on defendant David Nathanson's "willfully false" testimony in denying that he had filed a tax appeal; and 7) trial testimony and statements by defense counsel during summation referencing the redevelopment project constitute plain error to warrant a new trial. We address the issues seriatim.
Plaintiff's primary argument centers on Faps and plaintiff's claim that Judge Beglin erred in determining that Faps did not bar the Motel's claim for damages caused by the elimination of the front parking spaces.
In Faps, the State acquired "a narrow strip of defendant's land along the right-of-way" to widen Route 9. Faps, supra, 197 N.J.Super. at 46, 484 A. 2d at 36. Before the taking, access to defendant's property was uncontrolled and "drivers could use some 20-odd feet of State-owned property between the traveled way and the easterly line of the right-of-way to back out and maneuver from the area immediately in front of the commercial buildings." Id. at 47, 484 A.2d at 37. Because no defined driveways existed, "customers were able to use the unimproved part of the State's right-of-way," giving them ample parking and maneuvering room. Ibid.
However, the State in addition to the taking planned to construct a grassy berm along the front of defendant's property and three access driveways, thereby modifying access to defendant's property. Id. at 46-47, 484 A.2d at 36-37. "The combined effect of the taking and the change in access was to reduce the distance available *660 to park cars in front of the buildings" such that front parking was no longer feasible. Id. at 47, 484 A.2d at 37. The taking alone would have left sufficient maneuvering room; rather, the loss of parking resulted from "the access change which prevent[ed] use of the State-owned land." Id. at 47-48, 484 A.2d at 37.
We noted that the State owned the property on which the driveways were to be constructed before the taking; that is, the property at issue was the State-owned right-of-way as it existed before the taking. Id. at 48, 484 A.2d at 37-38. As such, defendant was not entitled to compensation for damages arising from "the use by the State of the State's own uncondemned property," nor was defendant entitled to compensation for damages arising from "[t]he limitation of access resulting from the installation of the berm." Ibid. As defendant's expert, at trial, "was unable to separate the effect the change in access had on his [ ] damage computation" from the effect of the taking itself, we remanded the case for a new trial. Id. at 48-49, 484 A.2d at 37-38.
In State v. Van Nortwick, 287 N.J.Super. 59, 62, 670 A.2d 548, 550 (App.Div.), certif. denied, 143 N.J. 320, 670 A.2d 1061 (1995), we further considered Faps and its application. In Van Nortwick, the State acquired part of defendant's property as part of a highway improvement project. As a result of the taking, access to the property was limited to the easterly end, the depth of the property failed to meet the minimum zoning requirement, and the amount of buildable area was reduced. At trial, defendant's expert acknowledged that his assessment of damages "all had a common thread, i.e., diminution of access," but that "the location of the permitted access," rather than "the denial of access to the property [ ] caused these damages." Id. at 66, 670 A.2d at 552. We rejected the State's argument that the testimony of defendant's expert should have been barred "because defendant's expert could not separate out his access per se damages from his on-site damages." Id. at 73, 670 A.2d at 556. We distinguished Faps, as Van Nortwick involved on-site damages resulting from "the restriction and location of the limited access, combined with the prevailing zoning requirements in the town," while the damages in Faps resulted from "[t]he loss of on-site maneuverability... due to the State's change in use of its own property which had previously been made available to the patrons of the property owner." Id. at 72-74, 670 A.2d at 555-56.
Judge Beglin explained that Faps "spoke of compensability for access for parking spaces located within the public right of way, not located outside of that right of way, but requiring usage of the right of way for maneuverability." However, since as here, "the loss of the parking spaces results directly from the taking, not from highway access modification," Judge Beglin found Faps inapplicable.
Although the judge inaccurately placed the parking spaces in Faps outside of defendant's property, see Faps, supra, 197 N.J.Super. at 47-48, 484 A.2d at 37, the error is of no moment. In Faps, the taking alone would not have eliminated the front parking as forty-four feet remained for parking use. However, the construction of a berm area with three driveways to permit access to defendant's property effectively eliminated the vehicles' ability to maneuver. The loss of the front parking was due to the loss of the use of State-owned land, a loss for which defendant was not entitled to compensation. Id. at 48, 484 A.2d at 37-38. Cf. County of Ocean v. Zekaria Realty, Inc., 271 N.J.Super. 280, 638 A.2d 859 (App.Div.) (rejecting defendant's claim for compensation of a permanent *661 easement previously granted to the county), cert. denied, 513 U.S. 1000, 115 S.Ct. 510, 130 L.Ed.2d 417 (1994). Defendant was not entitled to continue to use State-owned property for private purposes nor to demand continued unlimited access. Faps, supra, 197 N.J.Super. at 48, 484 A.2d at 37-38.
Here, while vehicles had utilized the State-owned right-of-way to maneuver out of the front parking spaces, the taking itself causes the loss of the parking. Unlike Faps, the taking encompasses the spaces themselves. Goodman opined that "[a]s a result of the takingit was tight before the taking and now it just isn't feasible to park there except maybe parallel to the building such as along the sidewalk curb but not very good parking there." Keller also stated that "[w]ith th[e] 15-foot wide taking, the new right-of-way line is within the parking spaces [which effectively] renders all of the parking spaces on that side of the building unusable. You can't even physically have the parking spaces on that side of the building without conflicting with the right-of-way." These factual observations are the defining distinction between this taking and that in Faps. Defendants did not simply lose maneuvering space for parking; they lost the parking itself.
The City argues that defendants bore the burden of showing that the City had approved the front fifteen parking spaces, a burden that defendants failed to meet, while defendants assert that they satisfied their burden, such that "the [c]ourt ruled as a matter of law that the parking places were legally created and entitled to nonconforming protection under both the ordinance and municipal land use law."
"[T]he basic issue in a condemnation proceeding is the amount of just compensation which the owner is to receive for the property taken by the condemning authority." Paterson Redevelopment Agency v. Bienstock, 123 N.J.Super. 457, 459, 303 A.2d 598, 599 (App.Div.1973). "The burden of proof concept has no place in such an inquiry." Id. at 460, 303 A.2d at 599. More meaningful is the parties' burden to "produce competent evidence of the fair market value of the condemned party." Ibid. (quoting State v. 45,621 Square Feet of Land, 475 P.2d 553 (Alaska 1970)). However, the burden may properly be placed on the property owner with respect to property value, where zoning regulations prevent the highest and best use of the land, thereby lowering the property value in a condemnation proceeding, see Jersey City Redevelopment Agency v. Mack Props. Co., 280 N.J.Super. 553, 564-66, 656 A.2d 35, 40-41 (App.Div.1995), or where the uniqueness of the improvements makes the comparable sales approach to valuation impractical and the landowner seeks "to demonstrate that the property has some value," see State v. Burnett, 24 N.J. 280, 289-92, 131 A.2d 765, 770-72 (1957). The situation here is analogous.
Whether the City had approved the parking spaces directly impacted on the value of the taking of that property. Thus, "[t]he burden may rightly be upon the landowner to demonstrate that the property has some value." Id. at 292, 131 A.2d at 772. Defendants do not dispute their burden, but rather, argue that they met this burden with ample evidence.
The City's arguments are directly stated. It claims that defendants failed to meet their burden by "fail[ing] to produce an original approved plan" and any revised sets of plans. The City argues that Judge Beglin improperly assumed that additional parking was approved because the unit expansion was approved, and that he effectively placed the burden on the City to show the plan had not been approved when *662 the judge did not find significant "[t]he absence [ ] of any recordation of separate approval of parking," as the City was entitled to choose the manner of its own record-keeping.
Defendants offered the approval by the governing body on December 1, 1970, for the addition of thirteen units to the motel. The approval made no specific mention of the parking plan. To establish their right to parking, defendants relied on Goodman, the architect of the 1970 site plan expanding the motel, who explained that the April 28, 1971, notation on the 1970 site plan represented the date when the building permit was issued and zoning approved.
Goodman further stated with certainty that the zoning approval "[a]bsolutely" included approval for the parking. He stated: "Zoning addresses the site conditions such as setbacks, parking, a whole host of things. And when zoning approves it, that's an indication that the design is acceptable to them and the approval is issued." Goodman remembered the parking issue and revising the plan "to find space for 13 additional cars" at the City's request. A report offered by defendants indicated that by "[c]onverting the parking spaces shown on the site plan to 9 foot by 18 foot spaces (current standards), 15 spaces would be provided."
Judge Beglin noted that the front property was the only available space on-site for parking. As a result, the judge found that "the plan presented in connection with the variance application showed that the owner proposed to locate that property ... in the front, along the property." The variance approval, then, included approval of this parking. As the spaces were legally created, the judge found that they, under "both the ordinance and the municipal land use lawenjoy nonconforming protection. That is, protection in terms of any subsequent changes on the site."
We will defer to a judge's factual determination, here, that the spaces were approved with the expansion, if the finding is supported by sufficient, credible evidence. See State v. Johnson, 42 N.J. 146, 165, 199 A.2d 809, 819-20 (1964); State v. Alvarez, 238 N.J.Super. 560, 564, 570 A.2d 459, 460 (App.Div.1990). The judge's findings meet that standard. His finding that defendants received approval for the front parking spaces with the approval for the expansion is supported by Goodman's testimony that the parking was approved and Goodman's site plan indicating the front parking and approval granted for the expansion.
As a result of these factually supported findings, Linden Code 31-36.1, providing that "the lawful use of land or buildings existing at the date of the adoption of this chapter may be continuous," applies, protecting defendants' use of the parking spaces.
A critical determination was that the use of the front parking spaces was grandfathered under the Access Code. The City challenges this ruling and argues that as a matter of law, the front parking spaces are illegal because their use required maneuvering in the State right-of-way, and therefore, their use could not be grandfathered by the Access Code.
N.J.S.A. 27:7-92a requires access permits for anyone seeking access to a State highway, but protects or "grandfathers" access "in existence prior to January 1, 1970," as if a permit had been issued. See N.J.S.A. 27:7-92c. N.J.A.C. 16:47-1.1 extended the grandfathering period, allowing "continuation of the lot access and use in existence on July 1, 1976." Furthermore, "[g]randfathered permits are subject to the same regulations as actual permits." N.J.A.C. 16:47-1.1.
*663 N.J.A.C. 16:47-3.5(11), however, now prohibits approval of access points "for parking areas that require backing maneuvers within the State highway right-of-way." Additionally, "[a]ll off-street parking areas must include on-site maneuvering areas and aisles to permit vehicles to enter and exit the site without hesitation." N.J.A.C. 16:47-3.5(1). The City argues that the front parking violates these regulations, making the parking unlawful at the time the Code was enacted and now.
The Supreme Court explained that "[g]randfather clauses operate to exempt from the requirements of legislative enactments certain defined individuals or entities that, at the time the requirements become effective, meet specific defined criteria." Paul Kimball Hosp. v. Brick Township Hosp., 86 N.J. 429, 440, 432 A.2d 36, 41 (1981) (Kimball). Relying on this language from Kimball, the City asserts that "[a] use that was unpermitted in the first place cannot be grandfathered."
We reject the City's argument. "Grandfather clauses reflect the legislative policy that the new regulatory process shall be effective prospectively." Kimball, supra, 86 N.J. at 441, 432 A.2d at 42. "Beneficiaries of grandfather clauses being exempt from a regulatory scheme created under the State's police power are not within the ambit of all requirements of that scheme." Ibid. Here, the Code allows "continuation of [ ] lot access and use in existence on July 1, 1976." N.J.A.C. 16:47-1.1. Thus, the "specific defined criteria" identified in Kimball that defendants must meet to be exempt from the Code's requirements are simply that the lot access and use existed on July 1, 1976; the parking spaces existed on that date. To adopt the City's view would require the Motel to comply with a regulatory scheme from which it is now exempt under the grandfather provisions. We decline to adopt such a position.
The City also argues that in 1971, the Code prohibited the use of any "part of highway right-of-way ... for servicing of vehicles, displays, or to conduct private business." According to the City, the use of the right-of-way by vehicles entering and exiting the parking spaces was prohibited at the time the parking spaces were constructed, rendering such use unlawful. Consequently, the access and use of the parking spaces could not have been grandfathered by the Code.
Of some interest, we did not comment in Faps on the propriety of defendant's use of the State's right-of-way to maneuver the parking spaces, but observed it as a fact. See Faps, supra, 197 N.J.Super. at 47-48, 484 A. 2d at 37. We did the same in Van Nortwick, noting that the State's "own property [ ] had previously been made available to the patrons of the property owner." Van Nortwick, supra, 287 N.J.Super. at 74, 670 A.2d at 556. Of course, in Faps, we remanded as a result of the erroneous admission of testimony regarding damages that included both compensable items, i.e., damage resulting from the taking, and noncompensable items, i.e., damage from the change in access and the State's use of its own property in constructing a berm area. Faps, supra, 197 N.J.Super. at 47-48, 484 A.2d at 37. As we previously noted, no parking was taken in Faps and even after the taking, sufficient area was available for maneuvering between the building and roadway. Ibid. In sum, in Faps, we had no need to specifically address the issue now raised here.
We reiterate what we observed earlier. The taking itself effected the loss of the fifteen parking spaces here. The "lot access and use" were grandfathered under N.J.A.C. 16:47-1.1 as they existed on July *664 1, 1976. A plain reading of this regulation allows continuation not only of the access to the lot, but the use of the lot. Judge Beglin properly found that the parking spaces were grandfathered under the Access Code.
The City next[3] argues that equitable estoppel does not apply, as the City never approved the parking spaces and therefore, defendants had nothing upon which they could, in good faith, rely; the City could not have approved the parking spaces as they constituted an unlawful use, precluding the application of equitable estoppel; and that defendants failed to satisfy the elements of equitable estoppel. We reject these arguments.
Though sparingly applied against municipalities, "[e]quitable estoppel may be invoked against a municipality 'where interests of justice, morality and common fairness clearly dictate that course.'" Middletown Township Policemen's Benevolent Ass'n. v. Township of Middletown, 162 N.J. 361, 367, 744 A. 2d 649, 652 (2000) (citing Gruber v. Mayor of Raritan, 39 N.J. 1, 13, 186 A.2d 489, 495 (1962)). See also Hill v. Bd. of Adjustment, 122 N.J.Super. 156, 162, 299 A.2d 737, 740 (App.Div.1972); Township of Fairfield v. Likanchuk's, Inc., 274 N.J.Super. 320, 331, 644 A.2d 120, 125-26 (App. Div.1994). When a municipal corporation "irregularly," but in good faith, uses a legislatively granted power, the conduct is ultra vires in the secondary sense, see Middletown Township Policemen's Benevolent Ass'n., supra, 162 N.J. at 368, 744 A.2d at 652, and equitable estoppel may apply where a party in good faith properly relied upon such authority. See Hill, supra, 122 N.J.Super. at 162, 299 A.2d at 740 (citing Summer Cottagers' Ass'n of Cape May v. City of Cape May, 19 N.J. 493, 117 A.2d 585 (1955)). "The essential principle of the policy of estoppel ... is that one may, by voluntary conduct, be precluded from taking a course of action that would work injustice and wrong to one who with good reason and in good faith has relied upon such conduct." Summer Cottagers' Ass'n, supra, 19 N.J. at 503-504, 117 A.2d at 590; see also Fraternal Order of Police v. Bd. of Trs., 340 N.J.Super. 473, 484, 774 A.2d 680, 687-88 (App.Div.2001).
Estoppel may apply even when a permit is not validly issued. See Hill, supra, 122 N.J.Super. at 163, 299 A.2d at 740-41. In Hill, we applied estoppel, where "a building inspector, in good faith, but with mistaken judgment, issue[d] a permit in violation of a zoning ordinance," upon which defendants relied in good faith. Id. at 160, 165, 299 A.2d at 739.
Here, Judge Beglin found as a matter of law that the City approved the 15 parking spaces when it approved the motel expansion. The City again complains that no such approval could have been given, see fn. 3, supra, at 393, 851 A.2d at 664, and any approval would have been void, as use of the parking spaces requires use of the State-owned right-of-way. An act that is "ultra vires in the primary sense" is conduct "`utterly beyond the jurisdiction of a municipal corporation.' " Middletown Township Policemen's Benevolent Ass'n., supra, 162 N.J. at 368, 744 A.2d at 652 (citing Summer Cottagers' Ass'n, supra, 19 N.J. at 504, 117 A.2d at 590). Such an act is void, precluding *665 the application of estoppel. Ibid. This is the focal point of the City's argument.
In Zekaria Realty, Inc., supra, 271 N.J.Super. at 281-83, 638 A.2d at 860-61, the County had exacted a permanent easement from defendant as a condition of variance and site plan approval for renovations. The approval "contained no approval for parking in front of [defendant's] building on the strip subject to the permanent easement." Id. at 282, 638 A.2d at 860. Despite defendant's easement grant and "without municipal or County approval, defendant subsequently used spaces for roadside parking on the available 125-foot frontage which was not part of the driveway entrance." Ibid. Eleven years after the grant, the County decided to widen the road fronting defendant's property and condemned a twenty-seven-foot wide strip of defendant's lot. Ibid. "Due to the fifteen-foot easement previously granted, as well as the lack of any known or permitted use for the strip, the County's appraisal report provided for no compensatory damages to defendant for the acquisition of that part of the property." Ibid.
The exaction was found unconstitutional. Id. at 283, 638 A.2d at 860-61. However, we held that defendant was not entitled to compensation in the condemnation proceeding due to defendant's failure to challenge the "`donative' conveyance of the fifteen-foot-wide road easement." Id. at 288, 638 A.2d at 863. The easement remained, rendering defendant's use of the space for parking unlawful and preventing defendant from receiving any compensation for the taking, as the property was rightfully owned by the county. While the parties are reversed here, equitable estoppel equally applies.
We view the City's position as a means of avoiding payment of just compensation for the taking. Cf. Riggs v. Township of Long Beach, 109 N.J. 601, 538 A.2d 808 (1988) (finding the Township's effort to justify the zoning ordinance by "link[ing] the reduction of lots to the designation of open space in the master plan [a]s nothing more than a red herring to divert attention from the true purpose of the ordinance," mainly, "to acquire the property for open space without paying a fair price"). The fifteen disputed spaces fronted defendants' property on a major highway for approximately thirty years, without any action by the City. The City was equitably estopped from arguing that no approval was given for these parking spaces.
The last two issues raised by the City involve discretionary determinations made by the judge. The first involves a denial of a motion for a new trial based on newly discovered evidence; the second raises the issue of whether certain comments made by the Motel's attorney during the course of the trial warrant a reversal of the jury verdict. We conclude that neither issue warrants a new trial.
The City claims that defendant David Nathanson gave "willfully false answers to interrogatories [by] fail[ing] to disclose tax appeals taken by [him] in 1995 and 1997," warranting a new trial.
In State v. Probasco, 114 N.J.Super. 546, 549, 277 A.2d 546, 548 (App.Div. 1970), aff'd, 58 N.J. 372, 277 A.2d 546 (1971), we said "that willfully false testimony of a witness may in some circumstances justify setting aside a verdict or judgment." However, the party seeking relief on this ground must show by "`clear, convincing and satisfactory evidence'" that the "`[p]erjured testimony [ ] warrants disturbance of a final judgment ... [and] willfully and purposely falsely given, and to have been material to the issue tried and not merely cumulative but probably to have controlled the result.'" Ibid. (quoting Shammas v. Shammas, 9 N.J. 321, *666 330, 88 A.2d 204, 208 (1952)). Additionally, the falsity must not have been discoverable by reasonable diligence prior to trial. Ibid. The City fails to establish a basis for relief under either standard.
Even if we assume that David Nathanson's answers were willfully and purposely falsely given, we fail to discern how defendant's 1995 and 1997 tax appeals were material to the value of the property at the time of the taking, or how their discovery would have affected the verdict. Finally, and equally as important, as Judge Beglin noted, the "evidence [ ] was in Linden City Hall all along" and "[a]ny party can seek to develop extrinsic evidence to impeach that which a party has said in discovery." He correctly denied the City's motion for a new trial on the basis of willfully false testimony by a witness.
Finally, the City argues that defendant's references to the "redevelopment project" constitute plain error, requiring a new trial. The City argues that such references "may well have been responsible for the jury rendering such a giant verdict in only twenty minutes."
The City points to two instances of erroneous reference to the redevelopment project by Izenberg during his testimony and two similar references by counsel during opening and summation. When Izenberg made his comment, the judge sustained an objection but no request was made for a curative instruction. No objection was made to counsel's comments during opening or summation.
Defense counsel's references to the redevelopment project were improper. "[T]he proper basis for compensation is the value of the property as it would be at the time of the taking `disregarding either the depreciating threat of or the inflationary reaction to [a] proposed public project.'" Mack Props., supra, 280 N.J.Super. at 569, 656 A.2d at 42 (citing Jersey City Redevelopment Agency v. Kugler, 58 N.J. 374, 379, 277 A.2d 873, 875 (1971)). See also Hous. Auth. of Atlantic City v. Atlantic City Exposition Inc., 62 N.J. 322, 330, 301 A.2d 441, 445 (1973) (stating that "[i]mprovements or changes contemplated by the condemning authority and undertaken at its expense cannot be taken into account in determining just compensation"). "[W]here it is possible to separate the element of damage to remaining lands due to use of the land taken from the owner, from the damage thereto flowing from the use of lands taken from others for the same project, the measure of damage is limited to that caused by use of the land taken from the owner." Pub. Serv. Elec. & Gas Co. v. Oldwick Farms, Inc., 125 N.J.Super. 31, 36, 308 A.2d 362, 364 (App.Div.), certif. denied, 64 N.J. 153, 313 A.2d 213 (1973).
However, as plaintiff's counsel failed to "request a curative instruction" and to object to defense counsel's opening and closing arguments, the plain error standard of review applies. See R. 2:10-2. First, "[w]hen evaluating whether the failure to give an instruction was error, a reviewing court `owe[s] some degree of deference to counsel's strategic or tactical decisions.'" State v. Nelson, 173 N.J. 417, 471, 803 A.2d 1, 33 (2002) (citing State v. Mays, 321 N.J.Super. 619, 633, 729 A.2d 1074, 1081 (App.Div.), certif. denied, 162 N.J. 132, 741 A.2d 99 (1999)). The judge met with counsel at sidebar to hear the objection, at which time counsel had the opportunity to request a curative instruction out of the jury's hearing. Plaintiff's counsel[4] failed to do so and the judge sustained the objection and testimony moved forward.
*667 Second, counsel's failure to object may be a reflection of counsel's belief that the statements are not prejudicial. See, e.g., State v. Cherry, 289 N.J.Super. 503, 527, 674 A.2d 589, 601 (App.Div.1995) (finding that "defendant's failure to object [to the prosecutor's opening argument] gives rise to the inference that he did not find the prosecutor's remarks to have crossed the bounds of permissible advocacy when they were made"); State v. Farr, 183 N.J.Super. 463, 469, 444 A.2d 593, 596 (App.Div. 1982) (finding "defendant's failure to object to th[e] cross-examination or the prosecutor's summation on th[e] issue indicates that he did not, in the context of the proofs, deem them prejudicial or improper"). Here, while plaintiff's counsel objected to Izenberg's testimony, counsel did not object to references to the redevelopment during defense counsel's opening and closing arguments. That such a failure was plaintiff's counsel choice or a matter "of passive indifference, if not acquiescence," may be inferred. See Hudgins v. Serrano, 186 N.J.Super. 465, 470, 453 A.2d 218, 221 (App.Div.1982) (recognizing at times that "for reasons of trial strategy or otherwise, experienced counsel elects to overlook an omission or inadvertence on the part of the trial judge").
Furthermore, a clear and firm jury charge may cure any prejudice created by counsel's improper remarks during opening or closing argument. See State v. Brooks, 309 N.J.Super. 43, 60, 706 A.2d 757, 766 (App.Div.) (finding that the jury charge, "considered as a whole, clearly and firmly directed the jury to disregard any comments" regarding the prosecutor's improper comments during opening argument, effectively curing any resulting prejudice), certif. denied, 156 N.J. 386, 718 A.2d 1215 (1998). Here, the judge clearly instructed the jury as to the damages issue and the elements which the jury could consider in measuring damages. This trial consumed four days and involved extensive expert testimony. We deem the fleeting, albeit improper, references to redevelopment to be harmless. We see no basis for our intervention.
Affirmed.
NOTES
[1] We focus our discussion on those facts relevant to the dispositive issue that we have identified. We will allude to and supplement our discussion of the facts as other issues are addressed.
[2] The City also filed a complaint to effect a taking of a 522 square foot parcel of land fronting Benedict Apartments. The parties settled that complaint, and it is not the subject of this appeal.
[3] We decline to consider the City's independent argument that the City had no authority to grant approval for use of the parking spaces requiring use of the State's right of way. The argument was not raised below and we will not consider it on appeal. R. 1:7-2; R. 2:10-2; Nieder v. Royal Indemnity Ins. Co., 62 N.J. 229, 234, 300 A.2d 142, 145 (1973).
[4] Plaintiff's appellate counsel was not trial counsel.