**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0614-19

MONTCLAIR STATE
UNIVERSITY,

     Plaintiff-Appellant,

v.

COUNTY OF PASSAIC,

     Defendant,

and

CITY OF CLIFTON,

     Defendant-Respondent.

_____

Argued February 1, 2021 – Decided April 16, 2021

Before Judges Rothstadt and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Docket No. L-2866-14.

Antonio J. Casas argued the cause for appellant (Windels Marx Lane & Mittendorf, LLP, attorneys; Antonio J. Casas, of counsel and on the briefs; Jeremy G. Weiss, on the briefs).

Risa M. Chalfin argued the cause for respondent City of Clifton (Wilentz Goldman & Spitzer, attorneys; Brian J. Molloy and Risa M. Chalfin, of counsel and on the brief).

PER CURIAM

This matter returns to us after remand, now on appeal from an order entered by the Law Division on April 29, 2019, denying plaintiff Montclair State University's (MSU) motion for voluntary dismissal of its complaint or for summary disposition, and from an order entered on August 22, 2019, after a plenary hearing, which denied MSU's application to proceed with a portion of a construction project at its campus.[1] For the reasons that follow, we affirm both orders.

## I.

This appeal presents the next chapter in the ongoing dispute between MSU and defendant, the City of Clifton, over MSU's plan to construct a new egress road from its campus to the off-campus intersection of Passaic County Road 621/Valley Road and MacLean Road (Valley Road Intersection), which

---

[1] The plan calls for the redesign of an existing ingress road so it could serve as an egress as well. According to MSU, the proposed egress road was critical to relieve traffic congestion and to provide an exit for one end of the campus.

is located in Clifton (the Project).[2] The Project was initially proposed in 2004 and since then the parties have been trying to resolve Passaic County's and Clifton's safety concerns about the proposed roadway. While their efforts resolved some issues between them, it left others without resolution.

One remaining issue was whether MSU was required to obtain municipal approvals from Clifton's land use boards for the installation of traffic control devices at the Valley Road Intersection. According to MSU, such approvals were not necessary under the Court's holding in Rutgers v. Piluso, 60 N.J. 142 (1972).[3] The County and Clifton disagreed, so MSU filed a complaint in the Law Division for declaratory and injunctive relief that sought an order permitting it to proceed with the development of the roadway.

In 2016, the Law Division entered an order dismissing MSU's complaint and directing that the matter go before Clifton's Planning Board. MSU

---

[2] Although the dispute had also involved defendant Passaic County's objections to the Project, the parties informed us that in 2019 the County's objections were resolved and a stipulation of dismissal as to its claims was filed with the trial court. And, on March 18, 2019, the County issued to MSU a Right of Way Access Permit.

[3] In Rutgers, 60 N.J. at 153, the Court held that although state universities possess a form of qualified immunity from local land use regulations, they must nonetheless: (1) act "reasonably" with respect to any proposed project; and (2) "consult with the local authorities and sympathetically listen and give every consideration to local objections, problems and suggestions in order to minimize the conflict as much as possible."

A-0614-19

appealed, and in a published opinion, we reversed, holding that under Rutgers, MSU was not required to seek municipal approvals and that on remand it was up to the trial court to determine whether MSU properly considered the County's and Clifton's safety concerns. Montclair State Univ. v. Cnty. of Passaic, 451 N.J. Super. 523, 527-28 (App. Div. 2017) (MSU I).

The Supreme Court granted Clifton's petition for certification and later affirmed our determination that local board approval was not required but modified our instructions to the trial court on remand. Specifically, the Court held that on remand, MSU must demonstrate not only that (1) the Project is inherently reasonable, and (2) it reasonably consulted with the County and the City "and took into consideration [their] legitimate [public safety] concerns," as required by Rutgers, but also that (3) "its planning has reasonably addressed the public safety concern." Montclair State Univ. v. Cnty. of Passaic, 234 N.J. 434, 454-55, 458 (2018) (MSU II). The Court added that, on remand, there must be "a discrete judicial finding that MSU's proposed action reasonably satisfies public safety concerns," id. at 458, and "a judicial finding as to the reasonableness of the public entity's action with respect to public safety." Id. at 459. It directed the trial court to make a determination on these issues and to decide, in its discretion, whether to proceed summarily. Id. at 439.

4

As already noted, prior to the remand hearing, Passaic County and MSU resolved their differences based upon safety features MSU added to the Project. MSU then filed a motion to dismiss its complaint as moot, or alternatively, for summary disposition of Clifton's claims. The trial court entered an order denying that motion on April 29, 2019.

Thereafter, the trial court conducted a three-day plenary hearing, and on August 22, 2019, determined that the Project was not safe and MSU had failed to reasonably address the City's legitimate public safety concerns about the Project through its planning. The court consequently barred MSU from proceeding with the Project as currently designed, placed its reasons on the record that day, and issued an order denying MSU's application to proceed with the Project. MSU now appeals from both orders.

On appeal, MSU contends that the trial court erred by: (1) denying its motion to voluntarily dismiss the matter or for summary disposition without holding oral argument; (2) disregarding significant evidence, including the County's approval of the Project; and (3) failing to provide sufficient findings of fact and conclusions of law in connection with both rulings as required by Rule 1:7-4. It also contends that we should vacate the trial court's order and

A-0614-19

exercise our original jurisdiction to determine the matter anew. We disagree with each of MSU's contentions.

## II.

The history of the Project and the parties' dispute are set forth at length in our and the Court's earlier opinions. MSU I, 451 N.J. Super. at 527-31; MSU II, 234 N.J. at 439-44. For our purposes here, suffice it to say that the remaining disputes between the parties focused on the horizontal and vertical alignment of the proposed roadway that determined its design speed. MSU planned for a design speed of twenty-five m.p.h. with a posted speed of fifteen m.p.h. Clifton, and initially Passaic County, wanted the design and posted speeds to be higher, set at thirty-five m.p.h. and twenty-five m.p.h. respectively, which would alter the roadway's alignment as proposed and correctly anticipate the actual driving speed of vehicles using the road. As the Court observed, "MSU declined to make that change, relying on its experts' conclusion that the road's planned . . . design speed and fifteen mile-per-hour posted speed would be safe, and that the alternative design was unsafe because it would encourage higher operating speeds." MSU II, 234 N.J. at 441.

6

MSU resolved Passaic County's concerns by adding "traffic calming" measures to its plans, which included: (1) the addition of a sidewalk on one side of the egress road; (2) reduced lane widths; (3) two speed limit signs with radar-controlled driver feedback that display a digital readout of a driver's speed; (4) dedicated "pull off" points for MSU Police Department patrol cars to enforce the speed limit; (5) chevron signage for the egress road curve to warn drivers and emphasize the curve; (6) "signal ahead" roadway markings approaching the intersection; (7) the use of high-friction pavement; (8) relocation of the traffic signal head for better visibility traveling down the egress road and; (9) the addition of a speed table to the egress road, which are longer and flatter than speed humps and used when the road's grade is greater than eight percent.

However, MSU maintained that the design speed for the roadway would remain at twenty-five m.p.h. and the posted speed limit would be fifteen m.p.h. (the same as the existing ingress road) and reiterated that it would continue to use a "[h]igh friction pavement surface" in the plans. In doing so, MSU relied upon the National Association of City Transportation Officials Urban Street Design Guide (NACTO Guide) regarding design speed.[4]

_____

[4] The NACTO Guide addressed design speed, in part, as follows:

According to the County's Board of Commissioners' resolution,[5] "both the Passaic County Engineer and the Passaic County Traffic Engineer have carefully reviewed the new submitted plans and agree that the updated plans now meet all of the safety concerns raised by the County both at the outset and in the litigation brought against the County by the University." The County issued a required permit. However, the revisions did not satisfy Clifton's concerns that were later the topic of the plenary hearing held by the trial court on remand.

Speed plays a critical role in crashes and the severity of their outcomes. Traditional street design was grounded in highway design principles that forgive driver error and accommodate higher speeds. This approach based the design speed and posted speed limit on 85th-percentile speeds—how fast drivers are actually driving rather than how fast drivers ought to drive. By designing for a faster set of drivers, crashes increase and drivers actually traveling the speed limit are put at risk. This passive use of design speed accommodates, and indirectly encourages, speeding by designing streets that account for the worst set of drivers and highest potential risks.

[5] The Board was previously known as the Passaic County Board of Chosen Freeholders.

A-0614-19

## III.

### A.

We begin our review by first addressing MSU's appeal from the trial court's April 29, 2019 order. Following the County's approval of the revisions to the Project, on March 29, 2019, MSU moved to voluntarily dismiss its complaint as moot under Rule 4:37-1(b), or for summary disposition under Rule 4:67-1(b). MSU included in its moving papers a request for oral argument if opposition was filed. Clifton filed opposition and asserted that despite the County's position, the roadway remained unsafe.

On April 29, 2019, without holding oral argument, the trial court denied MSU's motion. The order stated that "[t]he issues [MSU] seeks to resolve . . . ha[ve] been remanded back to the trial court by the Supreme Court. The trial court has determined a full hearing is necessary and . . . these issues are not to be decided in a summary fashion."

### B.

On appeal, MSU argues that its motion should have been granted because the matter was moot once the County approved the roadway design and the stipulation of dismissal was filed. According to MSU, "[n]otwithstanding its continuing objection to the Project, [Clifton] never

9

sought any relief in its pleadings other than a dismissal of the Complaint, so . . . the . . . settlement with the County rendered the matter as pleaded moot."

Alternatively, MSU contends that the court erred when it denied MSU's motion for summary disposition because (1) the County's decision to issue the permit was entitled to a presumption of validity; and (2) the County's approval of the Project was per se evidence that MSU satisfied the "reasonableness" standard. Finally, MSU asserts that the trial court's decision was procedurally flawed in that it failed to hold oral argument and failed to issue an adequate statement of reasons for its ruling. We disagree.

Rule 4:37-1(b), which governs voluntary dismissal by order of the court, states that "[a]n action shall be dismissed at the plaintiff's instance only by leave of court and upon such terms and conditions as the court deems appropriate." Adjudication of a Rule 4:37-1(b) motion "rests within the sound discretion of the trial judge." Shulas v. Estabrook, 385 N.J. Super. 91, 99 (App. Div. 2006). "When examining a trial court's exercise of discretionary authority," we will "reverse only when the exercise of discretion was 'manifestly unjust' under the circumstances." Newark Morning Ledger Co. v. N.J. Sports & Exposition Auth., 423 N.J. Super. 140, 174 (App. Div. 2011)

10

(quoting Union Cnty. Improvement Auth. v. Artaki, LLC, 392 N.J. Super. 141, 149 (App. Div. 2007)).

"An issue is 'moot when [a] decision sought in a matter, when rendered, can have no practical effect on the existing controversy.'" Redd v. Bowman, 223 N.J. 87, 104 (2015) (quoting Deutsche Bank Nat'l Tr. Co. v. Mitchell, 422 N.J. Super. 214, 221-22 (App. Div. 2011)). For instance, "[w]hen a party's rights lack concreteness from the outset or lose it by reason of developments subsequent to the filing of suit, the perceived need to test the validity of the underlying claim of right in anticipation of future situations is, by itself, no reason to continue the process." JUA Funding Corp. v. CNA Ins./Cont'l Cas. Co., 322 N.J. Super. 282, 288 (App. Div. 1999). Accord Wisniewski v. Murphy, 454 N.J. Super. 508, 518 (App. Div. 2018).

However, a resolution of the dispute between the original parties to an action does not necessarily render moot a related dispute between one of those parties and an intervenor. An "intervenor has standing in its own right to assert a claim or defense that presents a 'common' 'question of law or fact' with the pending action." N.J. Dep't of Env't Prot. v. Exxon Mobil Corp., 453 N.J. Super. 272, 290 (App. Div. 2018); see also Meehan v. K.D. Partners, L.P., 317 N.J. Super. 563, 568-72 (App. Div. 1998) (holding that the movant was

11

entitled to intervene as of right even after the original parties in the action had reached a settlement and the complaint had been dismissed). It is of no moment that the intervenor who filed an answer disputing a plaintiff's entitlement to relief did not, as here, file a counterclaim. See N.J. Dep't of Env't Prot., 453 N.J. Super. at 287 ("Rule 4:33-3 requires the movant to set forth a 'claim or defense' in its pleading to intervene." (quoting R. 4:33-3)).

Here, Clifton's rights as an intervenor were not extinguished simply because MSU settled with the County. Clifton not only maintained its right to an adjudication of its safety concerns independent of the County's issues, but that adjudication was mandated by this court and the Supreme Court. The Court made its ruling in response to Clifton's petition for certification and specifically directed the trial court to address Clifton's concerns on remand, which the Court deemed "necessary to properly protect the general public." MSU II, 234 N.J. at 458-59. "It [was] the peremptory duty of the trial court, on remand, to obey th[is] mandate of the [Supreme Court] precisely as it [was] written." Jersey City Redevelopment Agency v. Mack Props. Co. No. 3, 280 N.J. Super. 553, 562 (App. Div. 1995). Accord Tomaino v. Burman, 364 N.J. Super. 224, 232-33 (App. Div. 2003).

12

Also, under these circumstances, where the trial court was abundantly familiar with the parties' dispute, which by its nature required expert opinion evidence, we conclude the trial court did not abuse its discretion by not scheduling oral argument or determining the matter on summary disposition. Newark Morning Ledger Co., 423 N.J. Super. at 174 (stating that since a trial court's denial of summary disposition is a discretionary ruling, an appellate court will "reverse only when the exercise of discretion was 'manifestly unjust' under the circumstances" (quoting Artaki, 392 N.J. Super. at 149)).

Contrary to MSU's contention on appeal, without agreement of the parties and the trial court, summary disposition was not available under Rule 4:67-1(b). Under the Rule, "[s]ummary disposition is permitted by agreement of the court and the parties, evinced by 'a clear and unambiguous statement from the judge and the unequivocal consent of the parties to a final resolution.'" Grabowsky v. Twp. of Montclair, 221 N.J. 536, 550 (2015) (quoting Waste Mgmt. of N.J., Inc. v. Union Cnty. Utils. Auth., 399 N.J. Super. 508, 518-19 (App. Div. 2008)).

As to oral argument, although we agree that the trial court should have entertained oral argument under Rule 1:6-2(d), the court's failure to do so in this case was not clearly capable of producing an unjust result and did not

13

prejudice MSU in any way. See Finderne Heights Condo. Ass'n v. Rabinowitz, 390 N.J. Super. 154, 165-66 (App. Div. 2007); Spina Asphalt Paving Excavating Contractors, Inc. v. Borough of Fairview, 304 N.J. Super. 425, 426 n.1 (App. Div. 1997). In fact, we conclude that resolution of the motion did not require oral argument—for the reasons already discussed, the motion could not be granted. Triffin v. Am. Int'l Grp., Inc., 372 N.J. Super. 517, 524 (App. Div. 2004) ("[T]he motion judge nevertheless arrived at the proper result under the factual circumstances presented. . . . [The judge's] refusal to entertain oral argument is insufficient to require our intervention."). "[G]iven the record in this matter, we find no prejudice under the circumstances." Finderne Heights Condo. Ass'n, 390 N.J. Super. at 166.

Finally, we are satisfied that the trial court's written explanation for its order satisfied Rule 1:7-4. The order, although succinct, clearly stated that the trial court determined, in accordance with the Supreme Court's remand, that the parties' dispute and the execution of the court's obligations under the Supreme Court's remand were not amenable to summary disposition. Those reasons were sufficient to permit our meaningful review in this case, especially in light of our familiarity with the dispute as described in our and the Supreme Court's earlier opinions. See Finderne Heights Condo. Ass'n, 390 N.J. Super.

14

at 165 (holding that a trial court's findings and conclusions must be "sufficient to afford a meaningful review" on appeal).

## IV.

We turn our attention to MSU's appeal from the trial court's August 22, 2019 order. According to MSU, the trial court erred by concluding that MSU had not reasonably addressed Clifton's public safety concerns. Moreover, MSU contends that in reaching its conclusion, the court mischaracterized or ignored "critical" witness testimony, misapplied the Supreme Court's instructions, and again failed to provide sufficient findings of fact. We disagree with each contention.

## A.

At the plenary hearing, the parties agreed that there was no issue as to MSU's efforts over the years to consult with Clifton about its concerns. The hearing therefore addressed the other two elements identified in the Court's remand—whether the plan was reasonable and whether MSU addressed Clifton's legitimate safety concerns through planning. The primary dispute between the parties remained the design of the roadway, particularly its proposed design and posted speeds.

A-0614-19

MSU's presented testimony from its engineering expert, Gordon Meth; Passaic County's traffic engineer, Charles Silverstein; and Lieutenant Paul Giardino of the MSU Police Department. Clifton presented testimony witnesses from its engineering expert, S. Maurice Rached; Michael Glovin, Passaic County Counsel; and Edward Pasino, a Clifton resident whose home is adjacent to Yogi Berra Drive, the existing ingress road that is to be modified to add an egress from the campus.

## MSU's Expert

The trial court qualified Meth as an expert in the field of road safety and design based on his experience as a licensed professional engineer in New Jersey since 2000 who held various professional certifications and worked on various aspects of the Project since 2004. Meth's experience included roadway design, traffic studies, safety evaluations, feasibility assessments, and forensic analysis of roadways.

Meth testified that there are three components to roadway safety: enforcement, education, and engineering. Overall, he opined, to a reasonable degree of engineering certainty, that MSU's proposed design was "safe" and met "all applicable standards and codes for a roadway design at [twenty-five] miles per hour."

16

Meth described the physical layout of the existing ingress road and the proposed egress road as shown in MSU's December 2018 plans. He explained that the approximately 240-foot-long egress road will have two lanes approaching the intersection, one for traffic to turn left and one for traffic to turn right. A triangular island would prevent motorists from proceeding straight through the Valley Road Intersection, and a pedestrian crosswalk would assist persons crossing Valley Road on foot. Right turns onto Valley Road during red lights would be prohibited. Meth estimated that 3,459 vehicles daily, or 250-275 per hour, would use the proposed egress road to exit the campus.

Meth also discussed proposed changes to Valley Road. For instance, "existing striping" on Valley Road would be modified to provide a left-turn lane for turns onto MacLean Road and traffic into that lane would be "transitioned via taper." Valley Road would be widened, and its shoulder would be eliminated in certain spots to accommodate the left-turn lane. The traffic signal would have image detection and sensing, a "proven technique," that would detect cars coming down the egress road and ensure traffic flow. The signal would remain green for Valley Road unless there were vehicles waiting to enter the intersection.

17

Concerning the design speed of twenty-five m.p.h., Meth testified that it "is based on the controlling elements of the roadway," which are one horizontal curve and one vertical curve. He noted that the design speed of the horizontal curve, which is approximately a ninety-degree turn heading toward Valley Road, is twenty-five m.p.h. The design speed of the vertical curve, which transitions from a ten-percent downgrade slope to a two-percent downgrade slope approaching Valley Road, is also twenty-five m.p.h.

Meth testified that the roadway curves were designed in accordance with the American Association of State Highway and Transportation Officials (AASHTO) Manual's instruction that the design speed "takes into account sight distance and the [driver's] ability to see and stop" as they are proceeding through the curves of the roadway (even if traffic backed up) and that a design speed of twenty-five m.p.h. meant that "the road is safe for that speed." He explained that the sight line distance, measured along the vehicle's travel path, would be at least 200 feet.

When asked why a higher design speed was not chosen for the Project, Meth reiterated that "the upper range of what is appropriate for this instance is . . . [twenty-five] mile per hour operation" and he explained:

> In this context, we have a roadway that intersects a
> county road at a [ninety]-degree angle, and it is

specifically designed so everyone has to turn right or left when they proceed there. Because the traffic signal is actuated for demand and will rest in Valley Road for the most part, the condition under which people will be . . . approaching Valley Road will . . . either force them to stop or make a turn. Normally, right turns are taken at about [ten] miles an hour, left turns at about [fifteen] miles an hour. So . . . the key is, people have to either stop or slow down when they get to this location.

So the best practices of street management tell one that they should design the roadway . . . to feed that at appropriate speeds. Because this is . . . effectively, a T-intersection, because through movements are not permissible, it is . . . expected that people will have to slow or stop completely. Therefore, you do not want to bring people into that context too fast. So the upper range of what is appropriate for this instance is . . . [twenty-five] mile per hour operation.

Despite the fact that the Project proposed a ten m.p.h. differential between the design speed of twenty-five m.p.h. and the posted speed limit of fifteen m.p.h., Meth stated that "under current thinking the design speed for a roadway . . . should match . . . the target speed, which would also be the posted speed" per the AASHTO Manual and the NACTO Guide. Nonetheless, he explained that a fifteen m.p.h. speed limit was chosen for the Project because it: (1) helps "signal to drivers what a road can handle and what is

19

appropriate"; and (2) gives the MSU Police Department "more flexibility" with enforcement "to help curb [driver] behavior as part of speed management."

Meth explained that Clifton's objections to the lower design speed and posted limit were mistaken as there was no requirement that the posted speed limit had to be at least twenty-five m.p.h. and the AASHTO Manual "states that for low speed roadways . . . in built up areas or urban areas . . . you should design your roadways for the intended posted speed limit or operating speed instead of with a buffer." While not critical to the roadway's design, Meth believed the fifteen m.p.h. posted speed limit "actually helps indicate to traffic that the speeds should be contained and managed."

Meth also testified about the changes that MSU made to the Project design in order to satisfy the County's safety concerns. More specifically, concerning the reduced lane widths, Meth testified that an "ideal lane" width per the AASHTO Manual is twelve feet, usually for highways, but that they can be as narrow as ten or eleven feet. He admitted that the Project has ten-and-one-half feet lanes in the "area where Yogi Berra Drive is proposed to be two way" but that, further down the egress road toward the intersection, the lanes widen to eleven-and-one-half feet and twelve feet for the right turn lane. He testified that the MSU Police Department will be responsible for speed

20

enforcement and closure of the roadway in the event of inclement weather, that the two "pull-off" points for the patrol cars were located at the top of the roadway and not toward the intersection, and that the beginning of the right turn lane at the intersection provided "a third area for staging." He emphasized that the Project also included "self-enforcing" design aspects that encourage drivers to slow down, such as the speed table and the driver feedback signs.

As to Clifton's position, Meth testified that Clifton's proposed thirty-five m.p.h. design speed was "based on two flawed pieces of information": (1) Table 2-1 from the New Jersey Department of Transportation (NJDOT) Manual, that states there should be a ten m.p.h. differential between a new state highway's posted speed and its design speed, which is not applicable to the Project; and (2) a statutory minimum speed limit of twenty-five m.p.h., which does not apply to private roadways. Meth cited examples of other low-speed private roadways in New Jersey, including an egress road at another local university that had a posted speed limit of twenty m.p.h., a road at a county health facility with a posted speed limit of fifteen m.p.h., the existing Yogi Berra Drive ingress road with a posted speed limit of fifteen m.p.h. on part of the roadway, and other existing MSU campus roads.

21

Meth opined that a thirty-five m.p.h. design speed for the egress road, as urged by Clifton, was "inappropriate because of the fact that traffic has to either stop or make a turn at low speed" at the intersection and that his "main concern . . . from a speed management perspective [was] not wanting to encourage faster speeds." He explained that per the latest AASHTO Manual, "higher design speeds can lead to speeding" and that "[r]esearch has shown that a portion of drivers will migrate towards the design speed of a road." Consequently, if the design speed of the egress road was increased to thirty-five m.p.h., "traffic would end up being encouraged to come into the signal at relatively high speed" and it "would make the roadway less safe."

During cross-examination, Meth testified that he relied on the AASHTO Manual as well as the NACTO Guide. He denied relying primarily on the NACTO Guide but admitted that he wrote a letter to the County engineer which stated that the NACTO Guide was "the appropriate source of guidance." He reasoned that the AASHTO Manual quotes the NACTO Guide when discussing design speed, that the NJDOT Manual "specifically references" the AASHTO Manual, and that, therefore, "NACTO has been adopted by the State of New Jersey."

Meth acknowledged that in the NACTO Guide, NACTO describes itself as a "nonprofit association that represents large cities on transportation issues of local, regional, and national significance," that "views the transportation departments of major cities as effective and necessary partners in regional and national transportation efforts and promotes their interest in federal decision-making." When asked to admit that Clifton was "not a major city like New York or Chicago or even Hoboken," he responded that "the Valley Road portion of Clifton has streets and roads signed and marked for urban conditions just like New York City or any other major city" and that the NACTO Guide was applicable to the Project.

### The City's Expert

The trial court also qualified Rached as Clifton's expert "in the field of transportation services" based upon his experience as a licensed engineer in New Jersey who held various professional certifications and had worked as a traffic engineer for thirty-two years. His experience included managing engineers who design roadways, traffic signals and intersections, conducting safety studies, and working for the NJDOT for approximately fifteen years.

Rached explained that in 2014, he issued a report in which he opined generally that "the horizontal and vertical alignment of [MSU's] roadway was

not safe, in that it did not provide the proper sight distance for vehicles using the roadway" at the anticipated speed of twenty-five m.p.h. as compared to the unrealistic posted speed of fifteen m.p.h. proposed by MSU. He testified that, despite all of the changes that MSU made to the Project since 2014, he still believed that the proposed roadway design was not safe because "none of the[] changes improve[d] the vertical or horizontal geometry of the roadway."

Rached initially testified that MSU did not use the correct calculations for the design of the vertical curve, as recognized "nationally" and in the NJDOT Manual. However, on cross-examination, he confirmed that MSU's design was "adequate for a [twenty-five] mile per hour design" but inadequate for what he believed should be the design speed of thirty-five m.p.h.

Rached selected the thirty-five-m.p.h. design speed because it was more likely that drivers would operate their vehicles at twenty-five m.p.h. on the roadway and therefore would allow for the additional ten m.p.h. difference between design and posted speeds that the NJDOT recommended for highways. He relied upon the fact that vehicles entering the egress road from campus will be expected to slow down from the posted speed of twenty-five m.p.h. on the existing portions of the roadway to fifteen m.p.h. on the new egress, which was "not realistic," "unreasonably low, inconsistent with . . .

24

A-0614-19

statutory speed limits, . . . violates drivers' expectancy," and did not make the egress road safe. He could not recall ever approving a speed limit of fifteen m.p.h. during his time at NJDOT and testified that it was "very difficult to maintain a [fifteen] miles an hour speed limit on a downhill [grade] of 10 percent." He opined that the posted speed limit should be twenty-five m.p.h. instead, to correspond with a thirty-five m.p.h. design speed as per a table in the NJDOT Manual.

Rached also testified that, based on published data coupled with his own experience conducting hundreds of traffic studies, "it is very common that drivers," particularly younger drivers, "exceed the speed limit" and opined that "most drivers will drive between [twenty-five] and [thirty] miles per hour" with "a good portion" likely to drive over thirty m.p.h. on the egress road. On one occasion, he personally observed people driving "significantly above [fifteen] miles an hour going uphill" on the existing ingress road but acknowledged that the ingress road did not have any traffic calming measures.

Rached conceded that the NJDOT Manual indicates, like the AASHTO Design Manual, that "use of above-minimum design criteria may encourage travel at speeds higher than the design speed." Moreover, the design speed, according to Rached, did not make a "significant difference" in drivers'

25

operating speeds but he agreed that a higher design speed may "encourage" at least "some" drivers "to drive faster."

In addition, because vehicles would be traveling at twenty-five m.p.h. "the required stopping si[ght] distance is 175 feet" and MSU's plans only provided for a stopping sight distance is 165 feet. He explained that "stopping sight distance" is the distance the driver must be able to see in order to stop safely. According to Rached's 2019 report that was admitted into evidence, "using the [appropriate] AASHTO equation," "the design speed of [twenty-five m.p.h.,] and a downgrade of [ten percent], the [minimum] stopping sight distance is 176 feet." Also, the report noted that MSU's current design plans "reflect a roadway design based on a sight distance of 200 feet" and stated that if the design speed was thirty-five m.p.h., then "a si[ght] distance of 295 feet [would be] needed"; only then would the 200 feet stopping sight distance be "insufficient."

However, Rached testified that the Project's stopping sight distance was inadequate even for a design speed of twenty-five m.p.h. because Meth's measurement of the sight distance did not take into account "the sight distance to cars waiting for the signal" which means that vehicles headed toward the intersection "will potentially crash" with the vehicles already waiting in line.

26

He opined that drivers need "close to 300 feet of si[ght] distance to navigate this roadway safely."

Rached then addressed the effectiveness of the traffic calming measures that were incorporated into the Project design. He opined that none of them alleviated his safety concerns because they did not improve the stopping sight distance, but he admitted that they would "make some difference" in terms of driver speed. Concerning the lane narrowing, Rached opined that roadway widths of [ten] or [eleven] feet do not slow traffic "to a significant degree." He added that the lanes on the egress road widen to twelve and eleven-and-one-half feet toward the intersection, which are not considered narrow lanes, and which "should not cause a vehicle to slow down." He also testified that road signage is not "effective in significantly mitigating traffic speed" and that "[p]osting a speed limit sign that is unreasonable will not automatically cause people to obey it and drive the speed limit."

As to the speed table, Rached testified that while it will cause drivers to slow down, they will accelerate after they traverse it and the downhill grade of the road will encourage acceleration. Moreover, he opined that use of a speed table on the egress road was "not appropriate" because statutory requirements for speed tables mandate that they should not be installed on roadways that

27

service more than 3,000 vehicles per day but admitted that it "would do no harm."

Addressing the left-turn-lane taper on Valley Road, Rached explained that a taper "is a change in the direction of the roadway, so it guides vehicles from a straight path into a different path" and is demarcated on roadways by "a set of transverse lines bounded by longitudinal lines" as shown on the plans. He stated that there are "national rules" concerning the length of a taper "adopted by NJDOT, by Passaic County and by AASHTO and by all agencies" and that taper length must equal the lane width multiplied by speed. For example, if the lane width is ten feet and the speed is fifty m.p.h., then the taper length must be 500 feet.

Rached testified that the proposed length of the taper on Valley Road in the most recent plans is 310 feet, though previous plans referenced a 410-foot taper. He opined that this was inadequate given the lane width of twelve feet, the Valley Road speed limit of forty m.p.h., and an assumed Valley Road design speed of either forty-five or fifty m.p.h. Although his 2019 report did not address this issue in any detail, the conclusions listed on the last page include that "[t]he taper on Valley Road is approximately 410 feet. The required taper is 495 feet."

28

When asked during cross-examination whether he thought that MSU's use of a fifteen m.p.h. speed limit, as opposed to a twenty-five m.p.h. speed limit, would encourage drivers to drive faster, Rached replied that he did not. He admitted that using a design speed of thirty-five m.p.h. would encourage "some" drivers to drive faster. He also admitted that the egress road was a local road, that the NJDOT Manual refers to the AASHTO Manual for geometric design of roadways that are not part of the state highway system, and that he referenced both manuals in his 2019 report.

In addition, Rached acknowledged that the NJDOT Manual states that "[e]xcept for local streets where speed controls are frequently included intentionally, every effort should be made to use as high [a design] speed as practical." He stated that the AASHTO Manual provides: (1) "[o]n lower speed facilities, use of above minimum design criteria may encourage travel speeds higher than design speed"; (2) "[a] low design speed, however, should not be selected where the topography is such that drivers are likely to travel at high speeds"; and (3) "selected design speed should be consistent with the speeds that drivers are likely to travel on a given roadway."

Though Rached had previously testified about his reliance on the NJDOT Manual in connection with this case, he explained during redirect

29

examination that there was "nothing inconsistent" between his opinions and anything in the AASHTO Manual, and that the NJDOT Manual was "based on AASHTO." He added that MSU's reliance on the NACTO Guide was inappropriate because that manual "was designed for urban cities" such as New York City and Philadelphia.

<u>Passaic County's Engineer and Counsel</u>

Silverstein and Glovin testified about Passaic County's positions during its negotiations with MSU and the eventual settlement of the dispute. Silverstein, the County's traffic engineer since 1997, explained that he was familiar with the County's settlement agreement with MSU. He confirmed that the County's Commissioners' 2019 resolution accurately stated that he "agree[d] that the road is much safer than originally designed, and more importantly acceptable as revised," and "both the Passaic County engineer and [Silverstein] have carefully reviewed and resubmitted plans and agree that the updated plans now meet all of the safety concerns raised by the [C]ounty both at the outset and in the litigation brought against the County by the University."

Silverstein acknowledged that, initially, he had a number of safety concerns about the original plan for the Project because "the traffic might be

going down" the egress road "a little too quickly to safely stop at the bottom" near the Valley Road Intersection. The County had "assumed" that the speed limit was going to be twenty-five m.p.h., "the standard lowest posted speed limit" in New Jersey, which "would correspond to a design speed of [thirty-five]" m.p.h. per the NJDOT Manual, and he "didn't feel [the egress road] was designed" appropriately for the speed limit. However, Silverstein testified that MSU subsequently addressed the County's concern about the design speed because "they've made it clear on the revised plans that the posted speed limit will be [fifteen] . . . which corresponds to a design speed of [twenty-five]."

Silverstein also believed that the traffic calming measures taken by MSU would "act as designed . . . so that the majority of the drivers will drive at the speed limit." He stated that "[t]hey add[ed] to . . . safety and most of the features . . . will definitely have a traffic calming effect." Overall, he was "satisfied that the design of the roadway is safe" and testified that he had "no remaining concerns."

He denied that he was "still dissatisfied with the design speed of the road" as Glovin, the County Counsel, had claimed in an email sent to Clifton's attorney. He noted that his concern about the vertical curve was resolved because the design speed of that curve, and for the entire egress road, is now

31

twenty-five m.p.h. He acknowledged that the design of the ten percent grade and the horizontal curve had not changed since 2014. He also testified that the widening of the lanes approaching the intersection "is a good design practice on a curve."

Glovin testified about the email that he sent to Clifton's attorney which stated that Silverstein believed that the Project "now meets the conditions (except for the design speed) that we originally gave MSU . . . in 2008 and it will be difficult for the County to argue that the new design doesn't [meet] our safety concerns." According to Glovin, his representation about Silverstein's position was "a truthful statement."

### The MSU Police Officer

Giardino, a member of the MSU Police Department for over twenty-three years, testified for MSU about speed-limit enforcement by members of his department on campus as well as, by agreement, "in all of the municipalities [in] which the University sits," including Clifton. Giardino explained that officers enforce the existing fifteen m.p.h. speed limits on campus "when we can" but that those roadways are "in challenging locations and so it's not as easy" to situate the patrol car for radar detection. He

A-0614-19

acknowledged that there are "definitely people out there speeding" on the existing Yogi Berra Drive ingress road.

According to the officer, "pull-off" points in the Project design will make it easier for officers to enforce the speed limit on the egress road as they are situated at "pretty good locations to get a good view up and down the road." He admitted, however, that if a vehicle starts to exceed the speed limit traveling closer to Valley Road beyond the speed table "to beat the light," any patrol cars in the designated "pull-off" points will not be able to see the speeding vehicle and "enforcement is not going to be effective" under those circumstances. He also testified that the speed table and other traffic calming measures incorporated into the Project's design will "help slow down traffic" and "help [the officers] get a better handle on enforcing" the speed limit.

Concerning inclement weather, he said that the MSU facilities and grounds staff handles snow removal and treatment of the roadways and that officers remain in communication with them. In cases of severe winter weather, the MSU Police can close campus roads using gates, cones, or barricades "for a period of time until they can get properly treated and are . . . safe to be used."

33

Giardino also described the police department's procedure for enforcement of speed limits. He explained it was left to the patrol vehicles to enforce speed limits as part of their routine patrol of the campus. But, as noted, under the Project's design, space would be made available for patrolling officers to surveil drivers from a fixed post on the roadway, which they presently cannot do as there is no location for them to park.

The Neighbor

Pasino, who has lived adjacent to the MSU campus for nineteen years, testified about his observations of traffic on the existing ingress roadway that he can see from his home, and about his view of the vehicles from the Valley Road Intersection. Video recordings that he took were played for the court. They depicted cars having difficulty navigating the existing ingress roadway during bad weather and other vehicles speeding during fair weather.

When asked how he knew the vehicles' speed, he replied that: (1) he asked his wife to drive on the ingress road at fifteen m.p.h. so that he could observe it from his window and have a point of comparison; and (2) he had personally driven on the ingress road at fifteen m.p.h. and "routinely had cars stacked" behind him or passing him. He claimed that he had never observed a car on the ingress road "doing the speed limit except when they can't make it

34

up the road because of the climate conditions." He also stated that he had observed MSU patrol cars on the ingress road "a few times" and that he had seen at least three accidents there as well.

B.

After considering the evidence, on August 22, 2019, the court denied MSU's application, concluding that MSU failed to demonstrate that the Project was safe and that it had reasonably addressed Clifton's legitimate public safety concerns about the Project through its planning. In its oral decision, the court acknowledged that MSU had "continually improved" the Project plans, but found that "its latest iteration of plans dated December of 2018" was still not "safe at this point."

In reaching its conclusion the trial court primarily relied upon testimony about (1) the design speed and target speed/speed limit; (2) the effectiveness of MSU's proposed traffic calming measures; (3) the adequacy of the sight distance from the egress road to the intersection; (4) the adequacy of the left-turn-lane taper on Valley Road; and (5) the adequacy of the MSU Police Department's plans to enforce the fifteen m.p.h. speed limit on the egress road.

Concerning the design speed, the court rejected Meth's testimony about the safety and reasonableness of the Project's twenty-five m.p.h. design speed,

the fifteen m.p.h. target posted speed, his opinion that the proposed design satisfied AASHTO criteria, and his disagreement with Clifton's reliance on NJDOT standards. The court found that "[i]t should be noted . . . that there's a resolution from 2015 where the County does adopt [NJDOT] as its standards for its roads." It further found that "[w]hile AASHTO did state that the target [speed matching the design speed] was a more realistic standard . . . rather than build it in a speed differential," MSU and Meth "kind of eschewed that theory" and yet nonetheless used a ten m.p.h. differential between the design speed and the posted speed.

Instead, the trial court accepted Rached's opinion that the twenty-five m.p.h. design speed was unsafe and that MSU should have used a thirty-five m.p.h. design speed with a twenty-five m.p.h. target or posted speed because the egress road "was going to be used by at least 3,000 people a day." It also cited Rached's testimony that the design speed should take into account the fact that "a large majority of the drivers" using the road would be between the ages of eighteen and twenty-two, that young people drive faster than "the general driving public," and that the fifteen m.p.h. target speed was "clearly unenforceable."

36

Addressing Meth's testimony about the inclusion of a speed table, the narrowing of lanes as a speed retardant, and radar digital readout signs that would inform drivers of their speed when "coming down the hill leaving the campus," the court accepted Rached's opinion that a speed table was "improperly suggested" due to the "heavy volume" of traffic that would be using the proposed roadway.

The court also cited Rached's testimony that although the lanes narrowed at the very top of the roadway, they widened from ten-and-one-half feet to eleven-and-one-half feet after the speed table and to twelve feet at the intersection, thus the lane narrowing would only "have a temporary effect of slowing the speed down." The court added that, according to Rached's testimony, "cars would then pick up speed" as the road widened and "come down [the hill] at a faster rate, faster than the [fifteen] miles an hour" due to the roadway's "ten-degree incline," which "created a safety concern."

As to the issue of sight distance on the egress road, the trial court again rejected Meth's testimony that "if you measured from the curve [in the roadway] to the intersection, it complied with [NJ]DOT standards." Instead, it accepted Rached's opinion that Meth's "calculation was incorrect because rather than measuring from the curve to the . . . new intersection, you had to

account for cars that would back up and . . . measure from . . . the curve, which everyone agreed was the first vantage point that you could see the intersection and the last stack[ed] car."

As to the lane taper on Valley Road for the left turn lane onto MacLean Road, the court found, based upon Rached's testimony, that "it was supposed to be between 550 to 600 feet long to adequately, safely do its job" and that MSU's design reflected a taper of only 410 feet.

Addressing speed enforcement, the court found that Giardino's testimony did not "establish any kind of confidence with this [c]ourt that [MSU] could adequately enforce the speed limit." It explained that Giardino was "very non-committal" about speed enforcement on the egress road and that he "didn't provide any type of proposed schedule [as to] when a car would sit there and actually . . . speed check by radar." It expressed that it "was somewhat puzzled with the fact that there are four vehicles on patrol at any given shift" but "no designated route for which the vehicles have to cover."

The court also found that Pasino's testimony about his personal observations, for over eighteen years, established that while MSU "did an adequate job in clearing the road and plowing the road" in inclement weather, according to Pasino, "no vehicle traveled less than the speed limit . . . going up

38

that hill" on the ingress road. While recognizing that some of Pasino's testimony was anecdotal and objected to, the court emphasized that Pasino had "first-hand knowledge . . . that there was an excessive amount of cars traveling in excess of the [fifteen] miles an hour posted speed on the existing Yogi Berra Drive." It found that Pasino's testimony further "undercut any confidence th[e] [c]ourt had in the fact that the [MSU] Police, the patrol division, would and could adequately enforce the speed limit for the proposed Yogi Berra Drive" egress road.

## V.

Against this backdrop, we begin by addressing MSU's contentions that the trial court failed to follow the Court's instructions on remand by "ignor[ing] the Supreme Court's instructions" pertaining to the "reasonableness" standard, failing to apply it or analyze applicable law, and "treating the hearing in large part as a battle between the . . . experts, effectively rendering [MSU's] qualified immunity a nullity." We find no merit to this argument.

We conclude that the trial court met its obligation to "obey the mandate of the appellate tribunal precisely as it is written." Jersey City Redevelopment, 280 N.J. Super. at 562. Accord Tomaino, 364 N.J. Super. at

39

232-34 ("Adherence to this bedrock doctrine is vital to the proper administration and enforcement of the laws, promotes certainty and stability, and contributes to the actual and perceived integrity of the judicial system.").

As already noted, in its remand, the Court specifically directed that the trial court had to determine that the Project was inherently reasonable, MSU consulted with Clifton about its legitimate public safety concerns, as required by Rutgers, and MSU reasonably addressed Clifton's legitimate public safety concerns through its planning due to the Project's direct impact on non-state-owned property. Although the trial court did not make any specific findings as to the reasonableness of the Project, it concluded it was unsafe as designed. There was no dispute about there being sufficient consultation between MSU and Clifton. The trial court also determined that because of the safety issues described in Rached's expert opinion and what the trial court found was a confusing problem with the MSU Police Department's ability to enforce speed limits, MSU did not prove that it reasonably addressed Clifton's legitimate safety concerns. That reason alone was sufficient cause to deny the application in accordance with the Court's remand.

It makes no difference, as MSU contends, that Passaic County found the Project to be safe. While it cannot be questioned that the County's

determination was the result of its engineer's legitimate valid assessment that resulted in the County's acceptance of the Project's design speed, that determination did not bind Clifton as an intervenor.  R. 4:33-1; R. 4:33-2.

## VI.

Next, we assess whether, as MSU argues, the trial court's oral statement of reasons "failed to provide sufficient findings of fact and conclusions of law under [Rule] 1:7-4."  We conclude that the trial court's decision satisfied the requirements of the Rule.

In order for litigants and attorneys to understand the outcome of their disputes, and for appellate courts to be able to perform their function, it is imperative that a trial court sitting without a jury provide clear reasons for its decision.  Curtis v. Finneran, 83 N.J. 563, 569-70 (1980).  That requirement is incorporated into Rule 1:7-4, which states in pertinent part, "[t]he court shall, by an opinion or memorandum decision, either written or oral, find the facts and state its conclusions of law thereon in all actions tried without a jury."  R. 1:7-4(a).  "Naked conclusions do not satisfy the purpose of [Rule] 1:7-4. Rather, the trial court must state clearly its factual findings and correlate them with the relevant legal conclusions."  Curtis, 83 N.J. at 570.

A-0614-19

As we noted earlier, the trial court must provide reasons "sufficient to afford a meaningful review" on appeal. Finderne Heights Condo. Ass'n, 390 N.J. Super. at 165. "The trial court does not discharge [its] function simply by recounting the parties' conflicting assertions and then stating a legal conclusion." Avelino-Catabran v. Catabran, 445 N.J. Super. 574, 595 (App. Div. 2016).

Although the trial court's reasoning here could have been expressed with greater specificity and clarity, especially with regard to the conflicting expert testimony, its oral decision, spread over thirteen-transcript pages, sufficiently informed the parties and this court "of the rationale underlying" its findings and conclusions. Id. at 594-95. The court did more than recount the parties' assertions and state naked conclusions. It weighed and assessed the evidence before it, summarized the critical witness testimony, and, based upon that testimony, made specific factual findings regarding various safety concerns with the Project. Those factual findings, in turn, support the court's legal conclusion that MSU did not reasonably address Clifton's public safety concerns in its most recent design plans for the Project. When read as a whole, the court's decision adequately comports with Rule 1:7-4.

## VII.

Last, we address MSU's contentions that the trial court "mischaracterized and/or ignored critical testimony" from Meth, Silverstein, and Giardino regarding enforcement of the speed limit, gave "too much weight to the non-expert, anecdotal testimony" from Pasino, did not even consider Silverstein's testimony, and "improperly focused on a purported problem with the length of taper on Valley Road," as testified to by Rached. We find no merit to these arguments.

At the outset, we note that in an appeal from a bench trial, "[t]he scope of appellate review of a trial court's fact-finding function is limited." Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011) (quoting Cesare v. Cesare, 154 N.J. 394, 411 (1998)). Final determinations made by the trial court "premised on the testimony of witnesses and written evidence at a bench trial" are reviewed in accordance with a deferential standard. D'Agostino v. Maldonado, 216 N.J. 168, 182 (2013). "[W]e do not disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Seidman, 205 N.J. at 169 (quoting In re Tr. Created By Agreement Dated Dec.

43

<u>20, 1961</u>, 194 N.J. 276, 284 (2008)). However, a trial court's legal determinations are not entitled to any special deference and are reviewed de novo. <u>D'Agostino</u>, 216 N.J. at 182.

We conclude from our limited review that, except in one instance, the trial court reached its "reasoned conclusions" about the Project after properly evaluating the witness testimony and "sift[ing through] the competing evidence." <u>Allstate Ins. v. Northfield Med. Ctr., P.C.</u>, 228 N.J. 596, 619 (2017) (quoting <u>Griepenburg v. Twp. of Ocean</u>, 220 N.J. 239, 254 (2015)); <u>see also</u> <u>H.S.P. v. J.K.</u>, 223 N.J. 196, 215 (2015); <u>State v. Hannah</u>, 448 N.J. Super. 78, 90 (App. Div. 2016) (describing "the judge's dual role with regard to . . . admission and weigh[ing]" of evidence at a bench trial); <u>Pansini Custom Design Assocs., LLC v. City of Ocean City</u>, 407 N.J. Super. 137, 143 (App. Div. 2009) (explaining that a trial court "must weigh and evaluate the experts' opinions, including their credibility . . . in reaching a reasoned, just and factually supported conclusion"). For that reason, the trial court's determinations are entitled to our deference.

Contrary to MSU's contention, the trial court properly exercised its discretion in weighing the competing experts' testimonies and determining what portions to accept, and it expressed its reasons for doing so. This was in

44

accord with the trial court's right "to accept or reject the testimony of either side's expert, and [to] not adopt the opinion of either expert in its entirety." Brown v. Brown, 348 N.J. Super. 466, 478 (App. Div. 2002). Accord Pansini, 407 N.J. Super. at 144. Moreover, the trial court exercised its discretion to weigh the expert testimony against the other evidence and properly determined what weight to give to it when reaching its decision. See Torres v. Schripps, Inc., 342 N.J. Super. 419, 430 (App. Div. 2001) ("[E]xpert testimony need not be given greater weight than other evidence nor more weight than it would otherwise deserve in light of common sense and experience.").

Although the trial court's opinion is not the model of clarity, we are satisfied that in evaluating and weighing all the conflicting critical testimony, the court did not mischaracterize or ignore any of it and that its oral decision reflected that it "carefully scrutinized the testimony and the record before making factual determinations." State v. Locurto, 157 N.J. 463, 471 (1999). However, as MSU correctly argues, the court did not address or weigh Silverstein's testimony about his and the County's approval and his ultimate finding that he agreed with the Project's design speed and configuration. However, it is evident that Silverstein's agreement with MSU's design did not sway the trial court, so its omission from the court's findings does not warrant

a remand for the purpose of reconsidering in light of Silverstein's opinion and the County's approval.

Beginning with the expert testimony, the decision summarized the key portions of Meth's testimony pertaining to design speed, posted speed limit, traffic calming measures, sight distance, and his opinion regarding the Project's overall safety. The court questioned the reason for the ten m.p.h. differential between the Project's design speed and the posted speed limit, citing the AASHTO Manual guideline (which Meth conceded applied to the Project) that the design speed should match the posted speed limit. It then found that Rached rebutted much of Meth's critical testimony, noting Rached's opinion that: (1) the fifteen m.p.h. speed limit "was just clearly unenforceable" especially when "drivers between the ages of [eighteen] and [twenty-two]" drive faster than "the general public"; (2) the traffic calming measures, particularly the lane narrowing, would not effectively slow down drivers approaching the intersection; and (3) Meth miscalculated the sight distance.

In addition, the court made findings pertaining to Rached's testimony about the length of the left-turn-lane taper on Valley Road, and whether it was safe—a topic that Meth did not address in any detail during his testimony. The

46

court's attention to this issue was not improper, as the taper length affects the safety of motorists on Valley Road, a public roadway located within Clifton. MSU contends that the court overlooked Silverstein's testimony that there was no "problem with the length of th[e] tapers" from the County's perspective. While it is true that the court did not make specific findings about any of Silverstein's testimony, his only testimony about the taper length was that the County had approved it.

In contrast, Rached testified in detail that: (1) there are "national rules" concerning the length of a taper "adopted by NJDOT, by Passaic County and by AASHTO and by all agencies" and that taper length must equal the lane width multiplied by speed; (2) the length of the taper on Valley Road in the most recent plans is 310 feet, though previous plans referenced a 410-foot taper; and (3) the taper length was inadequate and unsafe given the lane width of twelve feet, the Valley Road speed limit of forty m.p.h., and an assumed Valley Road design speed of either forty-five or fifty m.p.h.

No one, including Meth or Silverstein, rebutted Rached's specific testimony regarding the exact measurements of the taper or the appropriate calculation for taper length. Thus, it was reasonable for the court to give more weight to Rached's testimony on that subject. The fact that the County

47

approved the taper, as emphasized by MSU in its brief, does not negate the City's own safety concerns about the taper length failing to comply with the relevant guidelines.

We do note that the trial court did not make explicit credibility findings about either expert. That said, credibility findings need not be articulated in detail so long as "the reasons supporting its determinations of the witnesses' relative credibility may be inferred from, and are well-supported by, the account of the facts and witnesses' testimony presented in its decision." Locurto, 157 N.J. at 472-74. When adequately supported, those determinations are entitled to deference since they "are often influenced by matters such as observations of the character and demeanor of witnesses and common human experience that are not transmitted by the record." Id. at 474.

Here, we infer from the court's decision and its ultimate conclusion that it found Rached's testimony to be more credible than Meth's–at least as to: (1) whether the fifteen m.p.h. speed limit was appropriate, realistic and enforceable; (2) the effectiveness of the traffic calming measures on the proposed egress road; (3) the adequacy of the sight distance; and (4) the adequacy of the left-turn-lane taper on Valley Road.

48

However, Rached's expert testimony was not the only evidence that the court credited. It also credited the lay opinion testimony from Pasino about his personal observations of vehicles frequently exceeding the fifteen m.p.h. speed limit on the existing ingress road. Although MSU criticizes Pasino's testimony as non-expert and anecdotal, it is well-established that lay witnesses may offer opinion testimony so long as the witness has "actual knowledge, acquired through the use of his senses, of the matter testified to." Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 1 on N.J.R.E. 701 (2020).

"It is clear that based on adequate visual observation an ordinary witness can state his conclusion of whether a car was moving fast or slow or give an estimate of its speed." Pierson v. Frederickson, 102 N.J. Super. 156, 162 (App. Div. 1968). Accord State v. McLean, 205 N.J. 438, 457 (2011) ("Traditional examples of permissible lay opinions include the speed at which a vehicle was traveling."). Here, Pasino had actual knowledge, acquired through his observations from his home and from standing on Valley Road near the beginning of the ingress road, of the vehicles traveling on the existing ingress road and stated his opinion based upon his observations. He presented video footage to the court depicting what he saw. The trial court, as factfinder,

was entitled to give that testimony due weight even though Pasino was not an expert. Pierson, 102 N.J. Super. at 162-63.

Furthermore, Pasino's testimony about vehicles frequently exceeding the fifteen m.p.h. speed limit on the ingress road, coupled with Giardino's testimony concerning the non-specific manner in which the MSU Police Department handles speed-limit enforcement, supports the court's determination that many drivers will exceed the fifteen m.p.h. speed limit on the proposed egress road and that it would not be enforced adequately— thereby affecting the safety of the Valley Road Intersection. The court found that Giardino "did not testify or establish any kind of confidence . . . that [MSU] could adequately enforce the speed limit." It expressed that it "was somewhat puzzled with the fact that there are four vehicles on patrol at any given shift" but "no designated route for which the vehicles have to cover" and found that Giardino was "very non-committal about" when the patrol officers enforce speed limits and "didn't provide any type of proposed schedule" as to when officers "would sit there and . . . speed check by radar."

The trial court's findings and determinations were not "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Rova Farms Resort,

Inc. v. Invs. Ins. of Am., 65 N.J. 474, 484 (1974). Instead, they were supported by expert testimony that was "grounded in 'facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts,'" Townsend v. Pierre, 221 N.J. 36, 53 (2015), and not "speculative opinions or personal views that are [either] unfounded in the record" or that contradict the record. Id. at 55. And, Rached's expert testimony was bolstered by the testimony of Giardino and Pasino, which altogether provided an adequate basis for the court's decision.

Although our judgment about the evidence might differ from that of the trial court, we cannot say, against the record developed here, that the court's findings were not "supported by adequate, substantial and credible evidence," carefully sifted from the testimony presented and properly weighed without any mischaracterization or ignoring any of the critical witness testimony. Casino Reinvestment Dev. Auth. v. Birnbaum, 458 N.J. Super. 173, 187 (2019) (quoting Rova Farms, 65 N.J. at 484).

51

## VIII.

Because we have concluded there is no reason to disturb the trial court's determination, we need not address MSU's remaining argument that we exercise original jurisdiction and decide the matter anew.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0614-19