# **RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2499-22
A-2500-22

N.S.,

     Plaintiff-Appellant,

v.

R.H.,

     Defendant-Respondent.

_____

R.H.,

     Plaintiff-Respondent,

v.

N.S.,

     Defendant-Appellant.

_____

     Argued March 13, 2024 – Decided April 22, 2024

     Before Judges Currier and Susswein.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket Nos. FV-04-2252-23 and FV-04-2251-23.

Mark Alan Gulbranson, Jr. argued the cause for appellant in A-2499-22 and respondent in A-2500-22 (Attorneys Hartman, Chartered, attorneys; Mark Alan Gulbranson, Jr., of counsel and on the briefs).

Ronald Glenn Lieberman argued the cause for respondent in A-2499-22 and appellant in A-2500-22 (Ridgen Lieberman, LLC, attorneys; Ronald Glenn Lieberman, of counsel and on the briefs).

PER CURIAM

Appellant N.S.[1] appeals from February 23, 2023 Family Part orders entering a domestic violence final restraining order (FRO) against him and denying his application for an FRO against his wife, R.H. The mutual domestic violence complaints were tried together. We heard oral argument on these appeals back-to-back and now consolidate them for the purpose of issuing a single opinion. After carefully reviewing the record in light of the governing legal principles, we affirm the FRO entered against N.S. Because the trial court did not make specific findings on whether N.S. needs an FRO for his protection, we remand for the trial court to consider the second prong under Silver and

---

[1] We use initials to protect the privacy and confidentiality of these proceedings. R. 1:38-39(d)(10).

determine whether R.H. requires an FRO for his safety.  See Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006).

I.

We discern the following facts and procedural history from the record. R.H. and N.S. were married in October 2017 and lived together with their children from prior marriages.  On the morning of January 26, 2023, the parties got into an argument regarding R.H.'s children.  R.H. testified she had a "panic attack."  She texted her best friend that she did not feel safe staying in the marital home.  N.S. sent her several texts that morning, including one in which he stated, "I also apologize for my behavior as of now I've struggled with a lot [of] cognitive issues and unfortunately my mental capacity and brain fog causes argument."

N.S. testified he began to pack a bag that evening because:

> [He] wasn't sure if [he] would need to leave the house because [he] had this feeling of anger from—from [R.H.] and [he] was worried that . . . would lead to a fight because two weeks previous to that [R.H.] gave [him] a black eye by hitting [him] five times in the face . . . with her hands, then a tissue box and actually bit [him] while [they] were laying nude in bed trying to go to sleep.

R.H. testified that when she returned home that evening, N.S. "was pacing the room throwing things into the suitcase and yelling at [her,] telling [her] [she]

3

needed to talk to him, calling [her] names. He told [her] [she] should kill [herself]." N.S. offered a different version, testifying R.H. came into the bedroom and did not address him. He claims he asked her if they could talk, and she ignored him.

The parties agree that at some point, R.H. left the bedroom. N.S. testified that after R.H. left the room, he locked the door. He testified R.H. subsequently "broke through the door," pushed him, and he pushed her back. He also claimed she "clawed" at him. He testified:

> I started screaming and hollering at her. I said some obscenities and she sat on the bed and I—I then just really at that point just got upset and then I grabbed the sheets and the bed and pulled her out into the living room, shut the door and called [9-1-1].

R.H.'s account is different. She testified, "[w]hen I came back the door was closed and I was not able to open it and it felt like he was holding the door closed so I couldn't open it, I'm not really certain." She explained, "when I did get through[,] it appeared that he had let the door go because it opened so suddenly that I fell. . . ." She testified that after she got into the bed and put her back against the headboard, N.S. "grabbed [her] feet and tried to pull [her] by [her] feet off of the bed." She testified he

> gripped the corner of the bed sheets and use[d] that as leverage to pull everything on the bed, including myself

4

and the suitcase off. I landed on my right shoulder. And then he took both of his hands under my armpit, my right armpit, and he dragged me on the floor into the living room and at that point I was hysterically crying and . . . I didn't know where my phone was and I was too afraid—I didn't know what he was going to do . . . . I didn't know what he was going to do so I ran to the front of the house and called my daughter and I said call[] [9-1-1] and I ran up—I ran up the steps and she had already dialed [9-1-1]. And as soon as—he was running after me and as soon as he saw that he stopped and he went back downstairs.

Both parties testified about past acts of domestic violence. R.H. testified N.S. had been physical with her in the past. She stated he had "pushed [her] and shoved [her] up against objects, probably around six or seven times," restrained her arms and hands five or six times, pulled her hair and spat on her a couple of times, pushed her out of bed, and had broken multiple doors. She also testified years ago, N.S. "woke up in the middle of the night, he wanted to have sex, I asked him to stop. I told him to stop multiple times and he did not."

N.S. testified that in December 2022, while they were arguing about the children, R.H. hit him in the face four times, and said "nobody would believe that [she] would do that because [she's] a 4'11', blonde cute girl . . . and you're this big guy." He also testified that in the summer of 2017, she punched him in the face approximately four times during an argument.

A-2499-22

Following the January 26 incident, both parties obtained temporary restraining orders (TROs) against each other. The FRO hearing on both domestic violent complaints was convened on February 23, 2023. The trial court permitted a judgment of conviction against N.S. for possession of an unlawful purpose and testimony about it into evidence. On March 9, 2023, the trial court rendered an oral decision, entering an FRO against N.S. and dismissing the domestic violence complaint against R.H. With respect to predicate acts of domestic violence, the trial court found "we have predicate acts going back and forth without question. The pictures of the injury at or near [N.S.'s] eye is indicative of an assault. But [] we also have predicate acts perpetrated by" N.S.

The trial court next addressed the question of credibility, explaining:

> So the real question here is one, credibility, and two, who has this need for a restraining order? Of course, the [c]ourt could just grant both [FROs] saying that both parties are in need for this protection. But I think that kind of is maybe inappropriate in most cases. In this particular case I find considering the way the parties testified, how they testified, their demeanor, how that demeanor is established, plus the fact that we have a conviction a crime by [N.S.] of an aggravated assault perpetrated on his mother, that there is an issue of credibility attacking his credibility. There's no similar concerns here with respect to [R.H.].
>
> The [c]ourt weighs the credibility. This of course is the case by the preponderance or greater weight of the evidence who the [c]ourt believes. Who is more

6

credible to that degree. And watching the two parties testify, how they testify, for example of how people respond to questions, whether there is a direct response to a question, whether the—one answers questions truthfully, honestly, and without hesitation. And in that light, [N.S.] is not a very credible witness, especially in comparison to [R.H.]. Both parties here appear to be flawed individuals, meaning that they suffer from disabilities, not physical disabilities, but emotional disabilities.

. . . .

The [c]ourt simply needs to determine who is a more believable witness. And I find that [R.H.], is a more believable witness.

Turning to the question of need for an FRO, the trial court explained:

I find that [R.H.] is certainly in need of this restraining order, that the abuse that she suffers from someone who . . . has a controlling behavior, who is someone who wants to monitor where she is, how she is. There's a number of factors that the testimony developed here and I'm going to find that she is in need of this restraining order. Her restraining order will be granted, [N.S.]'s restraining order will be denied.

This appeal follows. N.S. contends the trial court erred in relying upon evidence of his prior criminal conviction, using it improperly to establish a propensity for violence. He also contends the trial court erred in denying his request for an FRO against R.H.

A-2499-22

## II.

To provide context for our decision, we acknowledge basic principles concerning appeals under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. The purpose of the PDVA is to "'assure the victims of domestic violence the maximum protection from abuse the law can provide.'" G.M. v. C.V., 453 N.J. Super. 1, 12 (App. Div. 2018) (quoting State v. Brown, 394 N.J. Super. 492, 504 (App. Div. 2007)); see also N.J.S.A. 2C:25-18. Consequently, "'[o]ur law is particularly solicitous of victims of domestic violence,'" J.D. v. M.D.F., 207 N.J. 458, 473 (2011) (alteration in original) (quoting State v. Hoffman, 149 N.J. 564, 584 (1997)), and courts will "liberally construe[] [the PDVA] to achieve its salutary purposes," Cesare v. Cesare, 154 N.J. 394, 400 (1998).

When determining whether to grant an FRO pursuant to the PDVA, the judge must make two determinations. See Silver, 387 N.J. Super. at 125-27. Under the first Silver prong, "the judge must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19[(a)] has occurred." Id. at 125 (citing N.J.S.A. 2C:25-29(a)).

If the court finds the defendant committed a predicate act of domestic violence, then the second inquiry "is whether the court should enter a restraining order that provides protection for the victim." Id. at 126. While the second prong inquiry "is most often perfunctory and self-evident, the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29[(a)](1) to -29[(a)](6), to protect the victim from an immediate danger or to prevent further abuse." Id. at 127.

"[T]he Legislature did not intend that the commission of one of the enumerated predicate acts of domestic violence automatically mandates the entry of a domestic violence restraining order." Silver, 387 N.J. Super. at 126-27. The factors the court should consider include, but are not limited to:

> (1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;
>
> (2) The existence of immediate danger to person or property;
>
> (3) The financial circumstances of the plaintiff and defendant;
>
> (4) The best interests of the victim and any child;
>
> (5) In determining custody and parenting time the protection of the victim's safety;

(6) The existence of a verifiable order of protection from another jurisdiction; and

(7) Any pattern of coercive control against a person that in purpose or effect unreasonably interferes with, threatens, or exploits a person's liberty, freedom, bodily integrity, or human rights with the court specifically considering evidence of the need for protection from immediate danger or the prevention of further abuse.

[N.J.S.A. 2C:25-29(a).]

Although the court is not required to incorporate all of these factors in its findings, the PDVA "does require that 'acts claimed by a plaintiff to be domestic violence . . . be evaluated in light of the previous history of violence between the parties.'" Cesare, 154 N.J. at 401-02 (quoting Peranio v. Peranio, 280 N.J. Super. 47, 54 (App. Div. 1995)). Whether a restraining order should be issued depends on the seriousness of the predicate offense, on "the previous history of domestic violence between the plaintiff and defendant including previous threats, harassment and physical abuse," and "whether immediate danger to the person or property is present." Corrente v. Corrente, 281 N.J. Super. 243, 248 (App. Div. 1995). The second prong under Silver also "requires the conduct must be imbued by a desire to abuse or control the victim." R.G. v. R.G., 449 N.J. Super. 208, 228 (App. Div. 2017) (quoting Silver, 387 N.J. Super. at 126-27).

10

We add that as a general matter, "findings by a trial court are binding on appeal when supported by adequate, substantial, credible evidence." Gnall v. Gnall, 222 N.J. 414, 428 (2015). "We accord substantial deference to Family Part judges, who routinely hear domestic violence cases and are 'specially trained to detect the difference between domestic violence and more ordinary differences that arise between couples.'" C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020) (quoting J.D. v. M.D.F., 207 N.J. 458, 482 (2011)). "[D]eference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" MacKinnon v. MacKinnon, 191 N.J. 240, 254 (2007) (quoting Cesare, 154 N.J. at 412). Accordingly, we will not disturb a trial court's factual findings unless "'they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)). However, we do not accord such deference to legal conclusions, which we review de novo. Thieme v. Aucoin-Thieme, 227 N.J. 269, 283 (2016).

## III.

With those foundational principles in mind, we first address N.S.'s contention the trial court erred in using evidence of his prior conviction for

possession of a weapon for an unlawful purpose to establish a propensity for violence. We recount in detail the relevant circumstances. In 2018, defendant pled guilty to the weapons offense. The factual basis for the conviction was that N.S. pointed a knife at his mother and told her to "get the f**k out of [his] house."

The following colloquy occurred during the cross-examination of N.S.:

> [R.H.'S ATTORNEY]: Now, you've been with [R.H.] since approximately 2016, 2017?
>
> N.S.: Yes.
>
> [R.H.'S ATTORNEY]: So you were actually with her when you chased your mom around the house with a knife, correct?
>
> N.S.: Incorrect.
>
> [N.S.'S ATTORNEY]: Objection. Facts not in evidence, [j]udge.
>
> . . .
>
> [N.S.'S ATTORNEY]: Completely inappropriate question.
>
> . . .
>
> THE COURT: Well there's been developments of propensity for violence that you brought out from the cross-complainant. Now, the response is they want to bring that the—your client may have had a propensity towards violence. And the information on that question

12

makes reference to chasing someone around with a knife. That may not be true at all. But I assume there's a good faith basis for the attorney to ask that question so I'll permit it. Did you ever [chase] anyone around with a knife?

[N.S.]: I have never chased somebody with a knife.

[R.H.'S ATTORNEY]: That's perfect.

THE COURT: Thank you.

. . .

[R.H.'S ATTORNEY]: I'm going to show you what's been marked as [p]laintiff's [e]xhibit [fourteen].[2]

The court took a brief recess, after which N.S.'s counsel acquiesced to the admission of the judgment of conviction as shown in the following discussion:

THE COURT: Okay. I assume at this juncture the parties had an opportunity to review the exhibits and anything else that you worked out?

[N.S.'S ATTORNEY]: I really didn't have an opportunity to speak with [R.H.'s attorney]. Your Honor was in session. I did review everything. And I have an objection to the use of the complaint that was offered, which was what sparked my needing to leave. There's apparently a judgment of conviction <u>and that's obviously admissible</u>. But I don't believe that the complaint, which appears to be—it appears to be an exhibit that is duplicative anyway, but I don't believe that it's admissible. It's a hearsay document.

---

[2] Plaintiff's exhibit fourteen is N.H.'s judgment of conviction for possession of a weapon for an unlawful purpose.

A-2499-22

THE COURT: Fair enough. But almost anything can be used to cross examine a witness.

[N.S.'S ATTORNEY]: Sure. That's true. But I don't want him to be asked to read what it says because it's hearsay—

THE COURT: Correct.

[N.S.'S ATTORNEY]: —so he'd be reading hearsay into the record.

THE COURT: But if there is a judgment of conviction —

[N.S.'S ATTORNEY]: It addresses one of—one aspect of the complaint.

THE COURT: Does the judgment of conviction—

[N.S.'S ATTORNEY]: Pardon me?

THE COURT: —make reference to an aggravated assault with the—

[N.S.'S ATTORNEY]: It was a plea to a possession of a weapon.

THE COURT: Okay.

[N.S.'S ATTORNEY]: I mean, she can—I mean, I agree, she can certainly inquire about the basis of that, but I don't believe that it's appropriate to be using the complaint.

THE COURT: Fair enough.

14

[R.H.'S ATTORNEY]:  Thank you, Your Honor.  And just so we're clear, extrinsic evidence, that being the summons as well, can be used to, as Your Honor has said, to cross examine him.  So that's just what I'm doing.  And actually I think I sent this actually to [N.S.'s attorney] because it's available online to the [c]ourt system prior to today, just so that we're clear.

The following exchange then took place during the cross-examination:

[R.H.'S ATTORNEY]:  So, [N.S.], you've been with [R.H.] since approximately 2016, correct?

[N.S.]:  Correct.

[R.H.'S ATTORNEY]:  And you would agree the incident with your mother happened in March of 2018, correct?

[N.S.]:  Correct.

[R.H.'S ATTORNEY]:  And at that point you had taken a steak knife and pointed it . . . [at] your mother?

[N.S.]:  [Y]eah.

[R.H.'S ATTORNEY]:  Okay.  So you took that—it's described as a six inch blade, silver covered knife, and pointed it at her and . . . informed her to get the f**k out of your house, is that correct?

[N.S.]:  That is correct.

[R.H.'S ATTORNEY]:  Okay.  And then you had . . . grabbed her keys, which were attached to her purse strap, and then forcibly pulled her in a downward motion towards the ground, correct?

A-2499-22

[N.S.]:  Correct.

. . .

[R.H.'S ATTORNEY]:  Okay.  And children were present during this incident, is that correct?

[N.S.]:  For part of the incident.  Yes.

[R.H.'S ATTORNEY]:  Okay.  And ultimately . . . you were convicted of a possession of a weapon for an unlawful purpose, is that correct?

[N.S.]:  Yes.

N.J.R.E. 609(a)(1) provides "[f]or the purpose of attacking the credibility of any witness, the witness' conviction of a crime, subject to Rule 403, shall be admitted unless excluded by the court pursuant to paragraph (b) of this rule."[3] "[S]uch conviction may be proved by examination, production of the record thereof, or by other competent evidence."  R. 609(a)(2)(A).

We are not persuaded that in the present circumstances, N.S.'s prior conviction for possession of a knife for an unlawful purpose is relevant to his credibility.  We note, however, that N.S.'s counsel did not object and, indeed, affirmatively acknowledged the admissibility of the prior judgment of conviction.  Failure to object may be considered as opposing counsel's belief

---

[3]  Paragraph (b) of the rule pertains to prior conviction evidence after ten years and is not pertinent here.  See R. 609(b).

A-2499-22

that the statements were not unduly prejudicial. See <u>Linden v. Benedict Motel Corps.</u>, 370 N.J. Super. 372, 398, (App. Div. 2004); <u>see also</u> <u>Risko v. Thompson Miller Auto Grp. Inc.</u>, 206 N.J. 506, 523 (2011). We are not persuaded the admission of this evidence rises to the level of plain error. <u>State v. Green</u>, 447 N.J. Super. 317, 325 (App. Div. 2016); <u>see</u> R. 2:10-2 (Under the plain error standard, we disregard any such error unless "clearly capable of producing an unjust result.").

We also acknowledge that such evidence may only be considered for purposes of assessing credibility, not for establishing a propensity for violence. It is true, of course, trial courts in domestic violence matters may consider past acts of domestic violence, but that principle applies only to past acts of domestic violence between the parties, not to past acts of domestic violence involving a third party. <u>See</u> <u>R.G.</u>, 449 N.J. Super. at 220-21.

We do not agree with N.S.'s contention the trial court improperly relied on his prior conviction as substantive evidence. In its oral decision, the trial court suggested this evidence was used for purposes of assessing credibility when it stated:

> In this particular case I find considering the way the parties testified, how they testified, their demeanor, how that demeanor is established, <u>plus the fact that we have a conviction a crime by [N.S.] of an aggravated</u>

> assault perpetrated on his mother,[4] that there is an issue
> of credibility attacking his credibility.

The trial court in its oral decision did not explicitly state the prior conviction was used to establish propensity. It nonetheless would have been better if the trial court had expressly acknowledged the prior conviction could be used only in assessing credibility and not as substantive evidence. In sum, although we believe it was error to allow cross-examination on the circumstances of the prior conviction, in the absence of an objection or a request for the functional equivalent of a limiting instruction to a jury, we are not convinced the error warrants overturning the FRO issued against N.S., especially considering the other evidence establishing there was a physical altercation and past acts of domestic violence between the parties.

IV.

We turn next to N.S.'s contention the trial court erred in dismissing his domestic violence complaint against R.H. Although we are deferential to decisions made by Family Part judges, see MacKinnon, 191 N.J. at 253-54, that deference presupposes the trial court sets forth the reasons for its decision to

---

[4]  The judge incorrectly referred to the prior conviction as an "aggravated assault." As noted, defendant was previously convicted of possession of a weapon for an unlawful purpose.

permit meaningful appellate review. Here, the trial court found both parties committed a predicate act of domestic violence, holding, "[t]he [c]ourt will start with the fact that we have predicate acts going back and forth without question." Although the trial court explained why R.H. needed an FRO against N.S., the court did not make comparable findings with respect to N.S.'s need for an FRO against R.H. Furthermore, the trial court may have been under the misapprehension that there is a policy against issuing mutual restraining orders when it commented, "[o]f course, the [c]ourt could just grant both parties saying that both parties are in need for this protection. But I think that kind of is maybe inappropriate in most cases." We are aware of no precedent for the proposition that in most cases, it is inappropriate to grant mutual FROs. Nor do we subscribe to the notion that N.S. does not need the protection of an FRO against R.H. because the FRO entered against him will prevent inappropriate contact between the parties. We reiterate that when, as in this case, the predicate act involves physical violence and there is past physical violence, the need for an FRO, while by no means automatic, is nonetheless often perfunctory and self-evident. See Silver, 387 N.J. Super. at 126-27. The critical point is that the decision regarding the need for an FRO is case-sensitive and requires a careful analysis of all relevant circumstances. Because that analysis was not done with respect

19

to N.S.'s application for an FRO against R.H., we are constrained to reverse the dismissal of N.S.'s domestic violence complaint and remand for the trial court to determine from the hearing record whether N.S. needs an FRO for his protection. We instruct the trial court to make findings on that question in sufficient detail to permit appellate review if needed. We offer no opinion on whether an FRO should be issued against R.H.

Affirmed in part and reversed and remanded in part for further proceedings in accordance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION